No. 7 January 4, 2024 85

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

Scott KASLINER,
*Petitioner-Respondent,*

*v.*

STATE OF OREGON,
Department of Human Services, Child Welfare Services,
*Respondent-Appellant.*

Marion County Circuit Court
20CV34607; A178904

Sean E. Armstrong, Judge.

Argued and submitted June 21, 2023.

Inge D. Wells, Assistant Attorney General, argued the cause for appellant. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

George W. Kelly argued the cause and filed the brief for respondent.

Before Shorr, Presiding Judge, and Pagan, Judge, and Kistler, Senior Judge.

KISTLER, S. J.

Affirmed.

### KISTLER, S. J.

The Department of Human Services (DHS) investigated a report that petitioner had sexually abused his stepdaughter L. Based on its investigation, DHS issued a final order in other than a contested case determining that the report was "founded." On judicial review, the circuit court found that DHS had conducted a biased investigation. The court reasoned that, in conducting its investigation, DHS had focused on evidence that supported a founded determination without considering evidence of alternative explanations for L's report. The court entered a judgment remanding DHS's order and a supplemental judgment awarding petitioner attorney fees. DHS appeals both judgments, which we affirm.

When, as in this case, a person asks a circuit court to review an order in other than a contested case, the parties may submit evidence in the circuit court to supplement the record created by the agency. *Norden v. Water Resources Dept.*, 329 Or 641, 649, 996 P2d 958 (2000) (interpreting ORS 183.484). Moreover, ORS 183.484(6) "contemplates * * * [that the circuit court will make] findings of fact based on that record when it reverses the agency." *Id.* We accordingly summarize the facts developed before both DHS and the circuit court. We then describe the circuit court's ruling. We set out DHS's arguments, discuss the deference we owe the circuit court's factual findings, and explain why we affirm the circuit court's judgments.

Petitioner and wife were married in 2010. Wife brought three children from two earlier relationships into their family—two sons, R and J, and a daughter L. Several years later, petitioner and wife had a third son K. Throughout their marriage, wife has been the primary wage earner in the family, holding executive positions in various companies around the country. Petitioner, for his part, has held part-time jobs, primarily tutoring students to improve their scores on standardized tests. He and grandmother[1] assumed primary responsibility for caring for the children and maintaining the household.

---

[1] Grandmother is the mother of wife's second husband, which makes her J and L's paternal grandmother. Grandmother has lived with wife's family since wife and grandmother's son divorced.

In 2018, when L was 15 years old, she told her boyfriend and then her mother that petitioner had sexually abused her several years earlier when the family lived in Nevada and Virginia. According to L, the abuse started when she was approximately six years old[2] but ended before the family moved to North Carolina and later Oregon. After L reported that petitioner had abused her, her mother immediately took her to the Washington County Sheriff's Office, where the officers questioned L about her allegations. The officers notified DHS of the reported abuse, and DHS assigned a Child Protective Services employee Ruiz to investigate the report.

Ruiz spoke briefly to L and referred her to CARES Northwest for an evaluation. Ruiz also spoke with petitioner, wife, and L's brothers, J and K.[3] Ruiz requested but did not receive information from the other states where the family previously had lived. Based on what Ruiz described as L's clear and detailed reports of abuse to the officers and CARES, Ruiz concluded that L's report was "founded"; that is, Ruiz concluded that "there is reasonable cause to believe the [reported] abuse occurred." *See* OAR 413-015-1010(2)(a) (defining "founded"); *Querbach v. Dept. of Human Services*, 369 Or 786, 799-800, 512 P3d 432 (2022) (interpreting the phrase "reasonable cause" in DHS's regulations).[4] After two levels of internal agency review, DHS issued a final order in other than a contested case concluding that L's report of abuse was founded. In confirming Ruiz's conclusion, each level of internal agency review relied on the same factual basis that Ruiz had—the consistency and specificity of L's report.

Before the circuit court, petitioner supplemented the agency record by offering exculpatory evidence. For example, an expert, who is a psychologist and certified

---

[2] The record is not consistent regarding L's age when petitioner's alleged abuse began. The dates range from four to six years of age.

[3] Ruiz did not speak with R, who is several years older than L. When L reported in 2018 that petitioner had abused her, R no longer lived with the family.

[4] The Oregon Supreme Court has explained that "reasonable cause," as used in DHS's regulations, means something less than probable cause, and it suggested that the phrase means something more than "reasonable suspicion." *Querbach*, 369 Or at 799-800. The court did not have occasion to decide how much greater certainty, if any, a "reasonable cause" standard requires than a "reasonable suspicion" standard. *See id.*

specialist in evaluating sex offenders, testified. He noted that a qualified polygrapher had administered a polygraph examination to petitioner and had concluded that petitioner truthfully denied sexually abusing L. The psychologist also testified that, after administering a battery of psychological and other examinations to petitioner, he concluded that petitioner did not display a sexual interest in prepubescent children, nor did he pose a risk of sexually abusing them.[5] Additionally, both wife and grandmother testified that L does not have a reputation for truthfulness.

By and large, however, most of the evidence that petitioner offered in circuit court was directed at deficiencies in DHS's investigation. Petitioner introduced evidence that he or wife had tried to tell Ruiz about alternative explanations for L's report of abuse. Ruiz, however, rebuffed those efforts. Ruiz also actively discouraged wife from doing anything other than affirming her daughter's allegations against petitioner. For example, wife testified that "[Ruiz] told me that if I didn't cooperate fully and support my daughter in all of her allegations that all of my children would be removed from my home." Wife testified that, beyond the normal fear of losing custody of all her children, their threatened removal was particularly upsetting because her son J is a special needs child who requires substantial assistance. DHS did not call Ruiz to testify at the circuit court hearing; as a result, wife's testimony was unrebutted.

Petitioner's evidence also identified multiple issues that he and wife had raised with Ruiz that, as his expert testified before the circuit court, raised "red flags" and called for further investigation. For example, wife tried to tell Ruiz that years earlier her oldest son R had admitted to sexually abusing L at roughly the same time that L later reported petitioner had been abusing her and that the types of sexual abuse that R had admitted to wife paralleled the types of abuse that L later attributed to petitioner. Wife also tried to tell Ruiz that, when L had been in therapy in North Carolina seeking to deal with R's sexual abuse, L never mentioned to

---

[5] The expert was careful to explain that his conclusion that petitioner did not pose a risk of sexually abusing children did not necessarily mean that L's report was inaccurate.

her psychiatrist or her therapist what she later reported to the police in Oregon—that petitioner also had been abusing her. Ruiz did not ask wife any questions about her son's sexual abuse of L, and when wife mentioned the son's sexual abuse to CARES, she "was told that that abuse was irrelevant to the case."

The record shows that CARES primarily and Ruiz derivatively took the view that the oldest brother's sexual abuse was a closed chapter, that L had moved on, and that she was capable of distinguishing between her brother's abuse and the abuse that she attributed to petitioner. Before the circuit court, however, petitioner introduced expert testimony that the similarity and timing of the brother's and petitioner's reported abuse was more significant than CARES apparently had appreciated. And Ruiz's immediate supervisor at DHS acknowledged that DHS's records did not show that either Ruiz or CARES had explored the similarities between the oldest brother's sexual abuse and the abuse that L later attributed to petitioner.

Wife testified that Ruiz also had rebuffed attempts to tell her about two "major incidents" that occurred less than a month before L reported that petitioner had abused her. In one incident, a boy, who was almost 18, brought L home from a movie. They parked outside L's home so long that his car battery died. Given the three-year difference in L's and the boy's ages, petitioner and wife were concerned about their behavior. Wife spoke with L, and petitioner spoke with the boy. Petitioner asked the boy whether he thought his behavior was appropriate, given the difference in his and L's ages. According to wife, L became "really upset" and "really angry" at petitioner for interfering in her affairs.

In the other incident, also less than a month before L reported that petitioner had abused her, "another boy who was actually [L's] boyfriend at the time * * * climbed into [L's] bedroom window in the middle of the night." When petitioner and wife learned afterwards about the boy's visit, they spoke with him together. Wife testified that L "[a]gain [was] very very upset that we would get involved in talking to her boyfriend, that [L told them] we shouldn't speak to him, [and] that she could handle everything on her own."

When wife sought to raise those incidents with Ruiz as a possible explanation for L's report that petitioner had abused her, Ruiz was "very clear that [wife's] input wasn't what was important in the case." Ruiz told wife that she should "only support [her] daughter's accusations" and that she "should immediately *** g[e]t a restraining order and seek a divorce."[6] Consistently with that view, Ruiz's report does not mention either incident as a possible motive for L's report of abuse.

Before the circuit court, petitioner introduced evidence of other reasonable alternative explanations—such as L's substantial mental health issues, ranging from a bipolar condition to what L reported to CARES as "crippling anxiety," issues of control within the family, and petitioner's anger management issues—that could have led L to report that petitioner had abused her. Ruiz was aware of L's mental health issues and petitioner's anger management issues. The record does not show, however, that Ruiz explored those plausible explanations for L's report. As Ruiz's supervisor acknowledged on cross-examination, DHS's records did not reveal whether Ruiz or CARES had sought to determine the severity of L's mental health problems or how her longstanding mental health issues might have affected her perception.

As noted, DHS did not call Ruiz to testify before the circuit court. It did, however, call her immediate supervisor, Bromley, and a central staff employee, Harper, to testify. Bromley became Ruiz's supervisor as Ruiz was concluding her investigation of L's report. Given the limited time that he supervised Ruiz's investigation, Bromley's testimony was essentially limited to repeating what Ruiz had documented in L's file. For example, Bromley was unaware of the two major confrontations between L and petitioner that immediately preceded L's report of abuse, and he agreed on cross-examination that Ruiz should have explored those and other

---

[6] To the extent that Ruiz believed that wife needed to immediately divorce petitioner to protect L or the other children living at home, the record does not disclose the basis for that belief. After L first reported the abuse, petitioner moved out of the house and had no contact with L. L began college when she was 16 years old and had moved out of the family home (and Oregon) before petitioner returned home. Neither of the other two children living at home, J and K, claimed that petitioner had sexually abused them.

reasonable explanations for L's report that petitioner and wife had raised with Ruiz.

Harper is a DHS central staff supervisor, who conducted the final internal agency review of Ruiz's founded determination. She testified that, in concluding that L's report was founded, she considered both the record developed by DHS's investigation and the documentary evidence that petitioner submitted to DHS as part of its internal review process.[7] The circuit court, however, expressly found that Harper was not credible when she testified that she had considered petitioner's documentary evidence. The court stated that it based its credibility finding on Harper's tone, demeanor, and body language.

After considering that record, the circuit court issued a six-page letter opinion detailing the problems with DHS's investigation. The letter opinion stated that the court "finds that DHS conducted an incompetent and biased investigation that was designed solely to obtain enough evidence to support its 'founded' determination while failing to obtain or consider evidence that might have supported a different conclusion." The letter opinion summarized the factual basis for that finding:

> "DHS failed to obtain collateral source information offered by petitioner, failed to document its 'diligent' efforts to obtain that information, relied upon the conclusory statement that it could not obtain that information, refused to consider some information that petitioner offered to provide, failed to establish that the interviews that formed the basis for its 'founded' determination were not conducted in accord with any accepted protocol, and then made its determination of 'founded' based only upon the evidence it did gather—[L's] statements—evidence that only supported the conclusion it was predisposed to reach."

---

[7] Harper clarified on cross-examination that DHS rules constrained her ability to assess the significance of some of the documentary evidence that petitioner had submitted as part of DHS's internal review process. She explained that, if petitioner's submissions contained evidence that she lacked the expertise to assess, which she testified they did, she could not consult other sources to determine the significance of petitioner's evidence. Only Ruiz could have done that. And, if Ruiz had not taken that step or had not documented doing so, then Harper was unable to determine the weight to be given the exculpatory evidence that she lacked the expertise to assess.

The circuit court concluded that, in failing to consider those alternative explanations, DHS had not followed its own rules and, in so doing, abused its discretion. Moreover, the court found that DHS's bias undermined the reliability of its founded determination. Specifically, the court concluded that DHS's founded determination was not supported by substantial evidence, and it remanded DHS's order with instructions to enter an order that the agency was unable to determine whether the report was founded.[8] After the court issued that ruling, it awarded petitioner attorney fees.

On appeal, DHS assigns error to three of the circuit court's rulings. It contends that the circuit court erred in: (1) ruling that DHS's order was not supported by substantial evidence; (2) concluding that DHS abused its discretion in investigating L's reported abuse; and (3) awarding petitioner any attorney fees. We consider those issues in that order.

For the most part, case law establishes the principles that guide substantial evidence review of orders in other than a contested case. *See Cervantes v. Dept. of Human Services*, 295 Or App 691, 695, 435 P3d 831 (2019). As noted, the parties may supplement the record created before the agency by introducing evidence in circuit court. *Norden*, 329 Or at 649. In reviewing an order in other than a contest case for substantial evidence, a court assumes that the agency would have reached the same determination if it had heard the evidence introduced both before the agency and in the circuit court. *See id.* (explaining that, in reviewing for substantial evidence, the circuit "court's evaluation of the record [created before the agency and the court] is limited to whether the evidence would permit a reasonable person to make the [same] determination that the agency made in a particular case"). That is, the court asks whether the record developed before both the agency and the circuit court, viewed as a whole, provides substantial evidence to support the decision that the agency made. *See id.* at 647-48. In undertaking that inquiry,

---

[8] Although the court styled its ruling as a remand under ORS 183.484(5)(b)(A), we conclude that the court effectively "reversed" or "set aside" DHS's order for lack of substantial evidence under ORS 183.484(5)(c). The court cited both grounds in its letter opinion and judgment, and the latter ground appears to be the dispositive one. Otherwise, the court could not have directed DHS to enter a specific disposition on remand.

neither we nor the circuit court may focus only on the evidence that favors DHS's determination in deciding whether its determination is supported by substantial evidence. *See Younger v. City of Portland*, 305 Or 346, 354, 752 P2d 262 (1988) (interpreting the same phrase in a related statute). Rather, we must consider evidence that detracts from as well as evidence that supports the agency's determination. *See id.*

In this case, DHS argues that L's statements provide substantial evidence to support its founded determination. It also contends, contrary to the circuit court's findings, that it complied with its own rules in investigating L's report. Finally, it relies on *Querbach* for the proposition that petitioner could have remedied any deficiency in its investigation by submitting any evidence in circuit court that Ruiz had overlooked. It follows under *Querbach*, DHS argues, that the only issue on substantial evidence review is whether, considering all the evidence developed before DHS and the circuit court, substantial evidence supported its founded determination.

In relying on *Querbach*, DHS does not address, in any detail, an issue that *Querbach* reserved and that, as we explain below, potentially makes a difference in this case—namely, what deference, if any, is owed the circuit court's subsidiary factual findings in reviewing DHS's order for substantial evidence. The Oregon Supreme Court expressly noted that question in *Querbach* but did not decide it. 369 Or at 801 (explaining that "[t]he present case does not require a definitive answer" to that question). Instead, the court questioned whether the findings on which the petitioner relied in *Querbach* were factual findings that the circuit court had made. *Id.* at 801-02. For example, the Supreme Court noted that the petitioner in *Querbach* inferred from some of the circuit court's findings that DHS had been biased against him; however, the Supreme Court was careful to point out that the "trial court made no finding that DHS was 'biased' against [the] petitioner." *Id.* at 802.

Moreover, the Supreme Court reasoned that any defects in the investigation in *Querbach* did not affect the petitioner's ability to submit the evidence in circuit court that, in his view, DHS should have gathered. *Id.* It followed,

the court reasoned, that it need not decide whether any deference was due the circuit court's findings. *Id.* at 801-02. That is, the circuit court and the appellate courts in *Querbach* could fairly review the hybrid record created before the agency and the circuit court for substantial evidence, despite the defects in DHS's investigation that the petitioner had identified.[9] *Id.*

In this case, the circuit court expressly found that DHS had conducted a biased investigation, a finding that the circuit court in *Querbach* did not make. And, if DHS's investigation was biased, then its founded determination, which was based on that investigation, cannot provide a reliable starting point for a substantial evidence inquiry. Put differently, if we defer to the circuit court's factual findings, then petitioner's ability to supplement the record in circuit court cannot remedy a biased decision reached by the agency. It follows, we think, that this case requires us to decide the question that the court left unanswered in *Querbach*: What role, if any, do a circuit court's subsidiary factual findings play in substantial evidence review of an order in other than a contested case?

On that issue, DHS asserts that "[t]he [circuit] court's role is not to act as a factfinder itself." DHS, however, never identifies the basis for that assertion, nor does it explain how it reconciles its position with ORS 183.484(6), which requires a circuit court to make "special findings of fact" when it reverses an agency's order in other than a contested case. The role that the circuit court's subsidiary findings of fact play in substantial evidence review of an order in other than a contested case presents a question of statutory interpretation, which we resolve by considering the text, context, and legislative history of ORS 183.484.[10]

---

[9] A review of the briefs filed in the Supreme Court in *Querbach* reveals, as the court observed, that the investigative defects that the petitioner identified in that case were relatively minor. *See Querbach*, 369 Or at 803-04. As a result, the court had no occasion to decide whether more significant defects in DHS's investigation would call into question the assumption on which *Norden* based substantial evidence review—that the agency would have reached the same conclusion if it had been aware not only of the evidence introduced before the agency but also of the significant contrary evidence that was later introduced in circuit court.

[10] As noted above, the degree of deference that we owe the circuit court's subsidiary factual findings is critical to DHS's ability, as the appellant, to show that the circuit court erred in reversing DHS's founded determination. DHS does not

We begin with the text of ORS 183.484. ORS 183.484 contains two subsections that, at first blush, do not appear to fit neatly together. On the one hand, ORS 183.484(5)(c) provides that a circuit court "shall set aside or remand the [agency's] order if it finds that the order is not supported by substantial evidence." On the other, ORS 183.484(6) provides that, "[i]n the case of reversal the [circuit] court shall make special findings of fact based upon the evidence in the record and conclusions of law indicating clearly all aspects in which the agency's order is erroneous."

Ordinarily, substantial evidence review does not entail a reviewing court's making its own factual findings. *See* ORS 183.482(7) (explaining that on review of an order in a contested case, a "court shall not substitute its judgment for that of the agency as to any issue of fact"). Moreover, ORS 183.484(5)(c) and ORS 183.484(6) do not explicitly address the role, if any, that the special findings of fact that ORS 183.484(6) requires should play in substantial evidence review of an order in other than a contested case.

The court's reasoning in *Norden*, however, provides some insight into the relationship between those two subsections. As *Norden* makes clear, review of an order in other than a contested case differs from the procedures that apply in reviewing orders in contested cases. On review of orders in other than contested cases, the parties may supplement the agency record in circuit court with evidence that the agency never considered. *Norden*, 329 Or at 648. As the court observed in *Norden*, on review of an order in other than a contested case, "there may be no [agency] record to review or only so much record as supports the agency's order, until a record is made before the circuit court." *Id*. The court accordingly concluded that:

> "the reference in ORS 183.484 to the 'record' is to the record made before the circuit court and * * * the reference to 'findings of fact' in ORS 183.484([6]) is to the findings of fact that the circuit court makes based on the evidence in that record when it reverses the agency."

*Id*. at 647.

---

offer an extended analysis of that statutory issue; however, we conclude that that issue, which it identified in its opening brief, is appropriately before us.

*Norden* recognized that it is the parties' ability to create a record in circuit court that the agency never considered that gives rise to the circuit court's authority and sometimes obligation to make findings of fact "based on the evidence in that record." *Id.* To be sure, the court explained in *Norden* that the circuit court may not substitute its determination for the one that the agency made—in this case, DHS's determination that L's report was founded. *Id.* at 649. But the fact that a circuit court may not substitute its determination for the agency's ultimate determination does not mean that the subsidiary findings of fact that ORS 183.484(6) directs the court to make have nothing to do with the circuit court's (or our) evaluation of the record in conducting a substantial evidence review. *See id.* Indeed, it would make little sense to overlook the circuit court's finding in this case—that DHS's supervisor's testimony was not credible—in assessing the weight her testimony should be given in a substantial evidence review of DHS's order.

Although we think that the reasoning in *Norden* provides guidance in answering the statutory interpretation question this case presents, *Norden* does not provide a definitive answer to that question, as the court implicitly recognized in *Querbach*. *See Querbach*, 369 Or at 801. Accordingly, we also consider the context and history of ORS 183.484; that is, we trace the changes in judicial review of orders in other than contested cases from the enactment of the 1971 Oregon Administrative Procedures Act (the "Oregon APA") to the 1979 amendments to that statute, which resulted in what is now substantially the current text of ORS 183.484. *See Stephens v. Czerniak*, 336 Or 392, 401, 84 P3d 140 (2004) (explaining that context includes the statutory framework within which a statute was enacted).

In 1971, the legislature undertook a comprehensive revision of the statutes governing administrative law. *See Younger*, 305 Or at 352. Among other things, the legislature enacted ORS 183.480 (1971), which set out, in a single statutory section, the standards for judicial review of orders in both contested and other than contested cases. *See* Or Laws 1971, ch 734, § 18. The legislature allocated review of the former orders to the Court of Appeals and the latter to the

circuit court, as the current statutes do. *Id.* § 18(2). It also established an open-ended procedure for reviewing orders in other than contested cases. *Id.* §18(6). Specifically, it provided that "[r]eview of orders other than a contested case shall be conducted by the [circuit] court without a jury as a suit in equity." *Id.* That is, it provided for *de novo* review of those orders, with only one condition.[11] The 1971 act provided that, "[i]n the case of reversal the court shall make special findings of fact and conclusions of law indicating clearly all respects in which the agency's order is erroneous."[12] *Id.* § 18(8).

The legislative history of the 1971 act devoted little attention to judicial review of orders in other than contested cases. The issue did not prompt discussion, and the relevant wording remained largely unchanged as the bill went through the legislature. The history that does exist is consistent with the textual reference to reviewing those orders as a court would in a suit at equity. It states that "the Circuit Court is specifically empowered to make its independent judgment of fact" in reviewing orders in other than contested cases. Exhibit, Summary Statement of the Committee on Administrative Law of the Oregon State Bar, House Judiciary Committee, HB 1213, Apr 23, 1971, 4.[13]

In 1975, the legislature placed the procedures for reviewing orders in contested cases and orders in other than contested cases into two separate statutory sections. *See* Or Laws 1975, ch 759, §§ 14-16 (creating ORS 183.482 (1975) and

---

[11] No appellate decision addressed the procedures for review of orders in other than contested cases between 1971 and 1979, when ORS 183.484 assumed essentially its present form. We note, however, that the general rule in 1971 was that, in a suit in equity, a court would review the lower tribunal's ruling *de novo*; that is, it was free to assess the facts anew. *See Moore v. Brown*, 19 Or App 199, 205, 527 P2d 132 (1974).

[12] In contrast, the 1971 legislature specified with far greater precision the procedures for reviewing orders in contested cases. *See* Or Laws 1971, ch 734, § 18(6). The legislature confined our review to the record created before the agency and prohibited us from substituting our "judgment as to any issue of fact" found by the agency. *Id.* The 1971 legislature also specified the grounds for reversing or modifying orders in contested cases and thus limited a reviewing court's ability to depart from the agency's ultimate determination. *See id.* § (7)(d).

[13] The quoted exhibit is attached to the House Judiciary Committee minutes immediately after the April 23, 1971, committee hearing. It is unclear, however, from the legislative history when the committee received that exhibit.

ORS 183.484 (1975)). Aside from that organizational change, the 1975 legislature left the provisions for judicial review of orders in other than contested cases largely unchanged. *See id.*; Minutes, House Judiciary Committee, HB 2068, Jan 29, 1975, 3 (statement of Al Laue) (explaining that the procedures for reviewing those two types of orders were moved into separate sections primarily for clarification).

Regarding review of orders in other than contested cases, the 1975 act provided, in part:

"(3)   * * * The review shall proceed and be conducted by the [circuit] court without a jury as a suit in equity, and the court shall have such powers as are conferred upon a court of equitable jurisdiction.

"(4)   In the case of reversal the court shall make special findings of fact based upon the evidence in the record and conclusions of law indicating clearly all aspects in which the agency's order is erroneous."

Or Laws 1975, ch 759, § 16(3), (4).

In 1979, the legislature substantially revised the Oregon APA. *See* Exhibit A, House Judiciary Subcommittee, HB 2497, Apr 5, 1979 (1977 Letter from the Speaker of the House and the President of the Senate asking Legislative Counsel to undertake a "thorough review" of the Oregon APA). As a small part of that larger revision, the legislature amended the two statutory sections governing judicial review of orders in contested and other than contested cases. *See* Or Laws 1979, ch 593, §§ 24, 25, 25(a) (amending ORS 183.482 and 183.484). A representative from the Legislative Counsel's office explained that the House Judiciary Subcommittee had "decided to try to incorporate the judicial review provisions of the Florida Administrative Procedures Act into the Oregon's Administrative Procedures Act." Tape Recording, House Committee on Judiciary, HB 2497, May 7, 1979, Tape 60, Side 2 (statement of Elizabeth Stockdale). The Florida provisions that the Oregon legislature incorporated identify the grounds on which a reviewing court can set aside, modify, or remand an agency order. *Id.* Legislative counsel observed that, although the judicial review provisions that Oregon borrowed from Florida use different wording, they are "not really different in substance

from the [existing] Oregon law" governing review of orders in contested cases. *Id.*

Legislative counsel added, without further explanation, that "[t]he same amendments have been made for circuit court review of an order that is the result of other than a contested case."[14] *Id.* Incorporating those amendments into ORS 183.484 worked a larger change in the procedures for reviewing orders in other than contested cases. Specifically, it entailed removing all references to reviewing orders in other than a contested case as a court would in a suit at equity, and it added the standards now found in ORS 183.484(5), which identify when a court can set aside, modify, or remand an order in other than a contested case. *See* Or Laws 1979, ch 593, § 25a. In making those changes, however, the legislature left in place what is now codified as ORS 183.484(6). That subsection provides, as it has since 1971, that, when a circuit court reverses an order in other than a contested case, it shall make special findings of fact and conclusions of law indicating clearly all aspects in which the agency's order is erroneous.

The legislative history of the 1979 amendments does not specifically address the legislature's intent in amending ORS 183.484. It does, however, provide some guidance. Specifically, in moving from the open-ended review of orders in other than contested cases set out in the 1975 amendments to the more constrained review set out in the 1979 amendments, the legislature retained and reaffirmed the circuit court's obligation to make "special findings of fact" when it reverses an order in other than a contested case. *See* ORS 183.484(6).

In interpreting the relationship between what is now codified as ORS 183.484(5) and ORS 183.484(6), our goal is to give effect, if possible, to the terms of both subsections.

---

[14] Legislative Counsel submitted a report to the House Judiciary Subcommittee on the recommended changes to the Oregon APA. *See* Exhibit A, House Judiciary Subcommittee, HB 2497, Apr 5, 1979. That report largely parallels the explanation that Stockdale later provided to the House Judiciary Committee on May 7, 1979. *See id.* Although the report generated questions from the subcommittee on other proposed changes to the Oregon APA, no question touched on the procedures for judicial review of agency orders in contested and other than contested cases. *See* Tape Recording, House Judiciary Subcommittee, HB 2497, Apr 5, 1979, Tape 38, Side 2.

*See PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993) (stating that rule of construction). In doing so, we note that the requirement in ORS 183.484(6) that a circuit court make special findings of fact applies, as a matter of text, when the court "reverses"—*i.e.*, sets aside—an agency's order in other than a contested because "the order is not supported by substantial evidence," ORS 183.484(5)(c).[15] Indeed, setting aside an agency's order for lack of substantial evidence is the primary, if not the only, instance identified in ORS 183.484(5) in which the findings of fact required by ORS 183.484(6) would matter.

Holding, as DHS urges, that a circuit court's subsidiary findings of fact are irrelevant in substantial evidence review of an order in other than a contested case would reduce ORS 183.484(6) to a virtual nullity, which *PGE* directs us to avoid doing. Considering the text, context, and history of ORS 183.484, we conclude that courts should defer to a circuit court's subsidiary findings of fact that are supported by the record in reviewing an order in other than a contested case for substantial evidence.

With that statutory directive in mind, we turn to the question whether the court erred in setting aside DHS's order for lack of substantial evidence. As noted, the circuit court found that DHS's investigation, which led to its founded determination, was "biased."[16] Although DHS's procedures for internal agency review permitted petitioner to submit documentary evidence for the agency's consideration, the circuit court expressly found that DHS's witnesses were not credible when they testified that they considered

---

[15] What is now codified as ORS 183.484(5) begins by providing that a "court may affirm, reverse or remand [an agency's] order." That subsection then specifies when a court may "set aside," "modify," or "remand" the agency's order and identifies grounds for doing so. *See* ORS 183.484(5)(a) - (c). Although subsection (5) uses two related but slightly different sets of terms, we conclude that "revers[ing]" an agency's order includes "set[ting] aside" that order.

[16] DHS does not argue that that finding is not supported by the record, nor does it argue that the circuit court's finding of bias is not a subsidiary factual finding. It argues only that the circuit court's subsidiary factual findings are not relevant in reviewing for substantial evidence. *See Querbach*, 369 Or at 801-02 (leaving open the question whether, if the circuit court had made a finding of bias, any deference would be owed that subsidiary factual finding).

petitioner's evidence before issuing DHS's final order.[17] Two propositions follow from those findings. First, DHS's biased investigation fatally infected its determination that L's report was founded. Second, a founded determination that is the product of bias does not provide a reliable benchmark against which either we or the circuit court can measure the substantiality of the evidence in the hybrid record.[18]

Having made those factual findings, the circuit court reasonably concluded that it could not say that DHS's biased determination was supported by the record. Attempting to determine whether a biased decision is supported by substantial evidence is the antithesis of the fair procedures that ORS 183.484 was intended to provide. Conversely, the court could not say that L's report was unfounded. *See* OAR 413-015-1010(2)(b) (defining a report as "unfounded" when "there is *no* evidence the [reported] abuse occurred"; emphasis added). Rather, the circuit court remanded DHS's order with instructions to enter an order that DHS was "unable to determine" whether the reported abuse occurred. *See* OAR 413-015-1010(2)(c) (defining that option). Perhaps DHS could have raised other challenges to the circuit court's disposition. However, given the issues that DHS has raised on appeal, we cannot say that the circuit court erred in reaching that conclusion.

DHS assigns error to a second ruling. It argues that the circuit court erred in remanding DHS's order for abusing its discretion in investigating L's report. *See* ORS 183.484(5)(b)(A) (authorizing a remand for an abuse of discretion). DHS notes that, as a statutory matter, it could reach only one of three conclusions: L's report was unfounded; DHS could not determine whether L's report was founded; or L's report was

_____

[17] Moreover, as noted above, Harper testified that DHS's rules prevented her from looking to other sources to consider the value of the exculpatory evidence petitioner submitted when she lacked the expertise to assess the significance of that evidence.

[18] The proposition that an agency determination is the product of bias is separate from the proposition that the contrary evidence introduced in circuit court is significant enough that the assumption that underlies *Norden*—that the agency would have reached the same conclusion if it had heard all the evidence—loses its validity. *See Querbach*, 369 Or at 803 (noting that proposition). Our holding turns on the first proposition. We express no opinion on how the second proposition applies in this case.

founded. Because it had no discretion to do anything else, DHS argues that the question whether it abused its discretion in investigating L's report is either inapposite or not an independent basis for a remand.

We do not reach the merits of that issue because DHS did not preserve it. *See State v. Wyatt*, 331 Or 335, 345-47, 15 P3d 22 (2000) (explaining that an appellate court can consider whether an appellant preserved an issue even though the respondent does not contest preservation). On appeal, DHS does not contend that it raised and thus preserved the issue that underlies its second assignment of error—that any abuse of discretion in investigating L's report is either inapposite or not an independent basis for a remand under ORS 183.484(5)(b)(A). Rather, DHS argues that "the [circuit] court's reliance on that statute [ORS 183.484(5)(b)(A)] as a basis for remand was unanticipated, and thus, preservation principles do not apply."

We read the record differently. The circuit court issued two letter opinions on the merits. In its first letter opinion, the court reasoned that DHS's order should be reversed for lack of substantial evidence and asked petitioner's counsel to prepare a form of order. After receiving that request, petitioner's counsel submitted a memorandum to the court. In that memorandum, petitioner's counsel recited that he had circulated a proposed form of order to DHS's counsel, who objected to reversing DHS's order because the court's first letter opinion rested on DHS's abuse of its discretion in investigating L's report. Given that objection, petitioner's counsel suggested to the court that the more appropriate disposition was a remand to the agency under ORS 183.484(5)(b)(A).

The court agreed and withdrew its first letter opinion. More than a month after petitioner's counsel filed the memorandum, the court issued a second, revised letter opinion remanding DHS's order to the agency under ORS 183.484(5)(b)(A).[19] Between the time that petitioner's

---

[19] As noted above, we view the circuit court's second letter opinion as effectively reversing the circuit court's order for lack of substantial evidence. DHS's second assignment of error, however, takes a more formal view of the court's ruling.

counsel filed the memorandum and the time that the circuit court issued its second, revised letter opinion, DHS's counsel did not object to remanding DHS's order under ORS 183.484(5)(b)(A). Indeed, it appears from petitioner's memorandum that DHS's counsel was the person who suggested a remand under ORS 183.484(5)(b) rather than a reversal. At a minimum, the court's reliance on ORS 183.484(5)(b)(A) in its second letter opinion was not "unanticipated," and DHS had ample time to object to petitioner's suggestion that the court remand DHS's order under ORS 183.484(5)(b)(A). Because DHS did not do so, it failed to preserve the issue that underlies its second assignment of error.[20]

In its third assignment of error, DHS argues that the circuit court erred in awarding petitioner approximately $19,000 in attorney fees. DHS does not challenge the amount of the fees that the court awarded. Rather, it argues the court abused its discretion in awarding any fees under ORS 183.497(1)(a) and alternatively under ORS 183.497(1)(b). Because we uphold the court's fee award under ORS 183.497(1)(a), we need not decide whether ORS 183.497(1)(b) provided an alternative basis for awarding fees.

ORS 183.497(1)(a) provides that, in a judicial review proceeding under ORS 183.484, a court "[m]ay, in its discretion, allow the petitioner reasonable attorney fees" if it finds in the petitioner's favor. ORS 20.075(1) identifies a nonexclusive list of factors that guide a court's exercise of discretion in deciding whether to award fees. *See Necanicum Investment Co. v. Employment Dept.*, 345 Or 518, 522-23, 200 P3d 129 (2003) (ORS 20.075 applies to a court's exercise of discretion under ORS 183.497(1)(a)). On appeal, DHS argues that the circuit court erred in considering two factors listed in ORS 20.075(1).

We review the circuit court's decision to award attorney fees under ORS 183.497(1)(a) for an abuse of discretion; however, that discretionary decision "can involve predicate factual and legal determinations." *Ellison v. Dept. of Rev.*, 362 Or 148, 159, 404 P3d 933 (2017). We review predicate legal determinations for errors of law and predicate factual

---

[20] Given our resolution of DHS's second assignment of error, we express no opinion on the merits of the issue that assignment of error presents.

determinations for lack of supporting evidence. *Id*. With that preface, we turn to the two factors that DHS challenges.

ORS 20.075(1)(a) provides that, in deciding whether to exercise its discretion to award fees, a court shall consider "[t]he conduct of the parties in the transactions or occurrences that gave rise to the litigation, including any conduct of a party that was reckless, malicious, in bad faith or illegal." Applying that factor, the circuit court found that "DHS acted in bad faith in purporting to conduct an 'investigation' that the evidence showed did not meet its minimum standards."

DHS argues that the circuit court misinterpreted the term "bad faith" in ORS 20.075(1)(a). Specifically, DHS notes that, under *Mattiza v. Foster*, 311 Or 1, 8, 803 P2d 723 (1990), "meritlessness is a necessary precursor to a finding of bad faith" and that a meritless position is one "that is devoid of factual or legal support." DHS argues that, because its founded determination was not devoid of factual support, it did not act in bad faith, as *Mattiza* defined that term.

DHS's argument assumes that the court's decision in *Mattiza* applies to ORS 20.075(1)(a). *Mattiza*, however, was interpreting the phrase "bad faith, wantonly, or solely for oppressive purposes" in ORS 20.105(1)—a statute that specifies when a claim or defense will be so lacking in substance that a court may award fees on that basis alone. *See Mattiza*, 311 Or at 8 (explaining that it was interpreting the phrase "bad faith" "for the purposes of ORS 20.105(1)"). In that context, the court concluded that, at a minimum, the claim or defense must be meritless; it must be "entirely devoid of legal or factual support at the time it was made." *Id*. The federal and state cases on which *Mattiza* relied in announcing that standard reasoned that, if the standard were less stringent, it "could discourage all but the most airtight cases." *Christianberg Garment Co. v. EEOC*, 434 US 412, 422, 98 S Ct 694, 54 L Ed 2d 648 (1978); *see also Browning Debenture Holders' Committee v. DASA Corp.*, 560 F2d 1078, 1088 (2d Cir 1977) (reasoning that, if a less stringent standard applied, "those with colorable, albeit novel,

legal claims would be deterred from testing those claims in
*** court") (superseded on other grounds).[21]

The concerns that animated *Mattiza*'s interpreta-
tion of the phrase "bad faith, wantonly or solely for oppres-
sive purposes" in ORS 20.105(1) do not apply to the use of
the phrase "bad faith" in ORS 20.075(1)(a). ORS 20.075(1)(a)
focuses on whether the *conduct* that gave rise to the litiga-
tion was blameworthy. It does not focus on the merits of a
party's claims or defenses, as the statute at issue in *Mattiza*
does. Moreover, when ORS 20.075(1) addresses the merits
of a party's claims or defenses, it asks whether those claims
or defenses were "objectively reasonable," not whether they
were "meritless." *See* ORS 20.075(1)(b).

In our view, DHS errs in using the court's interpre-
tation of the phrase bad faith in ORS 20.105(1) to determine
the meaning of that phrase in ORS 20.075(1)(a). *Mattiza*
aside, we cannot say that the trial court erred in concluding
that DHS acted in bad faith when its investigator conducted
the investigation of L's report in violation of the agency's
rules and did so, as the circuit court found, because of bias—
namely, the investigator was "predisposed" to reach one con-
clusion. That is, given the circuit court's factual findings, we
cannot say that the court erred in applying ORS 20.075(1)(a).

DHS challenges a second factor that the circuit
court considered. It argues that the court erred in finding
that DHS's defense of its founded determination was not
"objectively reasonable." *See* ORS 20.075(1)(b) (identifying
"[t]he objective reasonableness of the claims and defenses
asserted by the parties" as a factor to be considered in exer-
cising discretion). DHS reasons that, even if it were wrong
in concluding that L's report was founded, its reliance on
L's statements to reach that conclusion demonstrate that its
defense of its order was "objectively reasonable."

If DHS had conducted a reasonable, unbiased
investigation, we would have little reason to question that

_____

[21] The court explained in *Mattiza* that, in enacting ORS 20.105(1), the Oregon
legislature borrowed the phrase "bad faith, wantonly or solely for oppressive pur-
poses" from a United States Supreme Court case that had identified that basis for
awarding fees but had not defined it. *Mattiza*, 311 Or at 6. The court accordingly
looked to state and federal cases interpreting that standard in determining when
ORS 20.105(1) will authorize a fee award. *Id.* at 7-8.

argument. The circuit court found, however, that DHS's investigator had not pursued reasonable alternative explanations for L's report, that she had failed to follow the agency rules that govern the investigation of reported abuse, and that she had conducted a biased investigation. Given those factual findings, the circuit court reasonably concluded DHS's defense of its order was not objectively reasonable. *Cf. Ellison*, 362 Or at 169-70 (looking to the trial court's factual findings in concluding that the agency's position was not objectively reasonable).[22]

Having upheld the two factors that DHS challenges, we conclude that the circuit court did not abuse its discretion in awarding petitioner attorney fees under ORS 183.497(1)(a). We accordingly affirm the circuit court's supplemental judgment and its judgment on the merits.

Affirmed.

---

[22] Relying on *Preble v. Dept. of Rev.*, 331 Or 599, 604-05, 19 P3d 335 (2001), DHS argues generally that it reasonably based its founded determination on L's statements; for that reason, it contends that no fees are warranted under ORS 183.497(1)(a) even if its determination was erroneous. This is not a case, however, like *Preble* where the sole question was whether the agency reasonably had interpreted a statute but, as it later turned out, had done so erroneously. This is a case in which the circuit court found that the biased and inaccurate way in which DHS conducted its investigation undermined the reliability of its founded determination.