24 January 4, 2024 No. 3

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

Gonzalo CALDERON,
*Petitioner-Respondent,*

*v.*

OREGON DEPARTMENT OF HUMAN SERVICES,
Children, Adults, & Families Division,
Child Welfare Services,
*Respondent-Appellant.*

Washington County Circuit Court
20CV42272; A179179

Theodore E. Sims, Judge.

Submitted May 5, 2023.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Inge D. Wells, Assistant Attorney General, filed the briefs for appellant.

Gonzalo Calderon filed the brief *pro se*.

Before Shorr, Presiding Judge, and Lagesen, Chief Judge, and Mooney, Judge.*

SHORR, P. J.

Reversed.

_____

* Lagesen, C. J., substituted for Pagán, J.

**SHORR, P. J.**

In the underlying judicial review proceeding, petitioner sought review of a final order of the Department of Human Services (DHS), which included a founded disposition of physical abuse by petitioner of his daughter, S. The trial court remanded the case to DHS for further action. DHS now appeals to us, asserting that the trial court erred in ruling that DHS's final order was not supported by substantial evidence. We agree with DHS, and reverse.

"When a court reviews an agency determination under ORS 183.484(5), the only issue is whether substantial evidence in the record 'viewed as a whole' supports the agency's determinations, and *** that standard is based on whether that record 'would permit a reasonable person to make that finding.'" *Querbach v. Dept. of Human Services*, 369 Or 786, 803, 512 P3d 432 (2022) (quoting ORS 183.484(5)(c)). "The court shall set aside or remand the order if it finds that the order is not supported by substantial evidence in the record." ORS 183.484(5)(c).

The underlying facts follow. DHS received a report of abuse regarding petitioner's 10-year-old daughter, S, and conducted an investigation. Petitioner is divorced from S's mother and had joint custody of S, who spent a portion of each week at each parent's house. The report to DHS happened after S's friends had noticed that S had self-harmed by cutting herself and they asked her about it. The friends told the school counselor, who talked with S, and then DHS was notified. Upon completion of its investigation, DHS determined that there was "reasonable cause to believe abuse occurred," which is a "founded" disposition. *See* OAR 413-015-1010(2)(a) ("'Founded' *** means there is reasonable cause to believe the abuse occurred."). Petitioner was notified of the founded disposition and of the fact that DHS believed that petitioner was responsible for the physical abuse of S.

Petitioner sought internal agency review, and DHS determined, as stated in its final order, that there was reasonable cause to believe that petitioner was responsible for the physical abuse of S. *See* OAR 413-015-0115(58) ("'Reasonable cause' as defined in ORS 419B.150 means a

subjectively and objectively reasonable belief, given all of the circumstances and based on specific and articulable facts."). DHS stated that its "decision was based on the following: The documentation, including medical records and law enforcement report, support that [S] made clear and credible disclosures to multiple sources that while angry with her, you have caused her physical harm and injuries on multiple occasions."[1]

The information that DHS had gathered was from several sources. DHS began its investigation in January 2020 after S disclosed to her friends that she had self-harmed by cutting. There were visible red cut marks on her arm. Someone at the school notified DHS that S had disclosed that petitioner would punch and kick her when she bounces her leg or fidgets with her hands. The punches were described as hits to the upper arm with a closed fist that would hurt for a while. S tried not to do anything to annoy petitioner; she was "getting stressed out" and sad and did not want to go to petitioner's home because she did not know what would "trigger" him. She had reported occurrences of once per week. S had also reported that petitioner called her the "B word."

The DHS caseworker assigned to the case, Ellison, interviewed S. S reported to him that petitioner physically abuses her every week, and that petitioner calls her names, kicks, punches, pushes, and has choked her; sometimes petitioner throws objects at her. S said that she was scared of petitioner and did not want to be alone with him. S also reported that she was not permitted to have or use a cell phone when she was with petitioner, therefore her access to her mother was cut off. S reported that she cuts herself to cope with the fear she has of petitioner and that she had started cutting the previous year. S told the caseworker that petitioner acts different when they are together with other people, and that her biggest worry is that she is afraid of what will cause him to abuse her.

Deputy Prince from the Washington County Sheriff's Office interviewed S at her mother's home. S reported that

---

[1] DHS did not file a dependency petition because S's mother addressed the safety concerns through the custody case between petitioner and her.

petitioner "smacks, hits, and kicks" her—sometimes in play, sometimes to annoy, and sometimes for discipline; in Prince's view, S did not seem to distinguish play hitting, angry hitting, and discipline. The last time petitioner left a mark on S from a hit was a couple of months prior when he had pushed her to the ground and punched her on the upper arm/shoulder area, which resulted in a dime-sized bruise that hurt. Prince observed the cuts on S's forearm, which "looked like superficial cat scratches."

CARES Northwest conducted a medical exam and forensic interview of S. Among information S provided, she described some of the incidents with petitioner. S stated that one time she refused to do extra homework that petitioner had told her to do, and he punched her on her arm. Then she told him that she wanted to stay with her mother, and he slapped her, kicked her, and told her that she was worthless and that her mother did not want her. S also described an incident in which she had gotten in trouble at school for skipping class with friends and playing with cell phones in the bathroom. When she told petitioner what had happened at school, he slammed her face down on the table and she hit her chin and a loose tooth got knocked out. S reported that petitioner hit her with random things like a pillow, a jacket, and a belt. S told the CARES interviewer that one time when she was in the library with petitioner and out of view from others, petitioner put his hands on her neck and choked her. S also disclosed that she had overheard her mother tell her stepfather, "I can't believe it's happening to [S] like it happened to me." The medical examination noted scars due to cutting with a knife. The CARES report states, in part, "In sum, the history available to us today and today's evaluation are diagnostic of emotional abuse and highly concerning for physical abuse. [S] described a repeated pattern of paternal behavior (hitting, belittling, intimidating, name-calling and saying she is unwanted by her mother)."

Ellison and Prince interviewed petitioner together. Petitioner denied that he ever physically disciplined S. Petitioner stated that he and S pray and that he talks with her—he said that he tries to focus on the positive and when they are upset with each other, they walk away from each

other. Petitioner switched topics when asked if he rough-houses with S, and never answered that question. Petitioner stated that S was "withdrawn" and that he found a counselor for S for depression and phone addiction. When asked about physical abuse with his former wife, he claimed that he had not hit or punched S's mother and that, instead, she was the one who was abusive to him. When asked whether he ever kicked S, he denied doing so, but then when asked if he ever might have lightly kicked S when she was fidgeting her leg, he said that he may have. Petitioner was asked whether he ever called S a bitch and he said that he did not remember doing so. Petitioner's explanation for why S would make claims about his behavior toward her was that she has difficulty telling the truth and he thought that she did not like it at his home because he does not let her use his phone.

Petitioner sought review of the final agency order by the circuit court. *See* ORS 183.484(1) (regarding jurisdiction and commencement of judicial review of orders other than contested cases). The court held a hearing at which two DHS employees testified. Petitioner supplemented the agency record by calling six witnesses to testify on his behalf; he did not testify himself. Petitioner's witnesses were people he knew through church and community programs. S did not make any disclosures of abuse to them. DHS's rebuttal witness, LaNier, who is a child safety program coordinator and also works as an assistant program manager for the Child Safety Division at DHS, testified that nothing she had heard from any of petitioner's six witnesses had affected her assessment that there was reasonable cause to believe the abuse occurred. She explained that "none of them were present at any of the points where they would have seen the abuse occurred [*sic*]. They didn't have anything else, other than character references about the dad." LaNier stated that if she were a child protective services worker, she would have assumed that they were "going to say exactly what they said and not have any information about whether or not the abuse occurred." She testified that it was common for children to not voluntarily disclose abuse, and the fact that petitioner's witnesses said that S never disclosed anything did not surprise her. LaNier also explained that DHS does not

require physical corroboration of abuse to make a finding of abuse "[b]ecause child abuse is something that happens in the privacy of one's home" and if DHS "required an injury to be present every time [it] received a report of abuse, parents would only have to keep their children home long enough so that the injury would disappear and then [DHS] would never know what abuse is occurring." LaNier testified that she did not see anything in the DHS assessment form that indicated that petitioner had told the caseworker or police officer to go talk to any other person about the allegations of abuse.

At the conclusion of the hearing, the court expressed concern about DHS accepting S's story "at face value without reasonably checking into it" and noted various additional information that, in the court's view, DHS should have gathered and considered. The court stated that "nobody bothered to check with the child's counselor to find out what was going on beforehand" and that "we don't have prior medical records to verify" reported weekly physical abuse. In the court's view, it "almost strains credibility where a child would report that level of weekly abuse and yet show * * * no physical signs."

The trial court acknowledged that four of petitioner's six witnesses were character witnesses who were understandably discounted by DHS. However, the court commented about the testimony of two of petitioner's witnesses that it thought worthy of DHS's consideration. One was a female volunteer at the church food pantry, O'Rear, who was 29 years old at the time of her testimony. O'Rear knew S and petitioner. S sometimes helped O'Rear and they had private conversations about their interests or school. They were close when S was between the ages of seven and ten. S never told O'Rear that petitioner punched, kicked, choked, or insulted her, and O'Rear never saw any bruises on S, nor did S ever seem distressed. O'Rear testified that S was "very outspoken" and "doesn't have a filter when she speaks," so she thought S would have been comfortable enough to disclose to her if there were concerns with petitioner. The trial court stated that it "would think it appropriate that the

agency would consider the fact that no disclosure was made there might be of some significance."

The trial court also commented on petitioner's last witness—an 80-year-old man, who is a friend of petitioner and has known him and S since approximately 2012 when he and petitioner taught ESL classes and S was in nursery care at the church where that program was held:

> "I am concerned that you discounted his comments about how the child behaved. Because, frankly, a child who's being physically abused on a weekly basis is not likely to display herself to folks who are paying attention, like Mr. Locke clearly was, as a happy-go-lucky child. That strikes a very discordant cerebral mode and is worthy of—of the agency's consideration."

The court also stated that it did not believe that DHS was successful in compartmentalizing what DHS viewed as "distasteful conduct" by petitioner toward S's mother that happened years ago.[2] Ultimately, the court stated that it was remanding " to the agency for additional work on this," and a judgment reflecting that decision was entered.

On appeal to us, DHS contends that its founded disposition is supported by substantial evidence because a reasonable person could have found from the evidence in the record as a whole, including the supplemental record before the trial court, that DHS had reasonable cause to believe that petitioner subjected S to physical abuse. DHS asserts that S made consistent and detailed disclosures about the abuse to her friends, her school counselor, DHS, law enforcement and CARES Northwest; and that DHS "found S's disclosures to be credible, and in contrast, found petitioner's 'systemic' denial of any abusive conduct to be 'unbelievable.'" In addressing the trial court's statement that "additional work" needed to be done, DHS contends that any claimed deficiencies in its investigation do not undermine

---

[2] S's mother, who is originally from Tonga, reported that, at the approximate age of 15, her parents gave petitioner, who is 25 years older than her, permission to marry her after he had sexually abused her. She also reported that petitioner was abusive to her during their marriage, which eventually caused her to divorce him. The trial court took "judicial notice of the fact that it is lawful in several states in this country to be married that young." S's mother was 17 years old when S was born.

its reasonable cause determination. In response, petitioner urges us to affirm the trial court's decision, in part, because, in his view, the testimony of his witnesses at the hearing called into doubt the accuracy of DHS's investigation and conclusion. Petitioner argues that the trial court correctly ruled that DHS's "final disposition was in error because it was not supported by any significant evidence."

As the Supreme Court has explained, "'founded' determinations are not determinations that petitioner *in fact* abused the [child] in the ways that were alleged, but rather that DHS had 'reasonable cause to believe' that he had done so—meaning that, given the evidence in the record, an objectively and subjectively reasonable person could believe that petitioner had abused the [child] in the ways alleged." *Querbach*, 369 Or at 804 (emphasis in original). The court also acknowledged that "evidence indicating significant flaws in DHS's analysis" does "have a role in substantial evidence review." *Id.* at 803. It explained:

> "[A] person in petitioner's position challenging [a founded] determination might be able to present evidence to the circuit court that so thoroughly undermines the evidence that *supports* the determination that the record as a whole would not permit a reasonable person to conclude that DHS had reasonable cause to believe that the reported abuse had occurred. But evidence of flaws in DHS's analysis that falls short of doing so *** is insufficient to permit reversal of the agency's order under ORS 183.484(5)(c)."

*Id.* at 803-04 (emphasis in original).

In *Kasliner v. State of Oregon*, 330 Or App 85, 100, ___ P3d ___ (2023), decided today, we held that when reviewing an order in other than a contested case for substantial evidence, "courts should defer to a circuit court's subsidiary findings of fact that are supported by the record." In *Kasliner*, the trial court considered exculpatory evidence that the petitioner had added to the record during the court's review proceeding—including testimony by an expert psychologist and two relatives that the teen girl who reported abuse did not have a reputation for truthfulness. *Id.* at 87-88. The petitioner also introduced evidence that he and his wife had attempted to tell the DHS employee who

was assigned to investigate about alternative explanations for the alleged abuse, but that DHS worker rebuffed those efforts and actively discouraged the petitioner's wife from doing anything other than affirming her daughter's allegations against the petitioner. *Id.* at 88. The trial court issued a six-page letter opinion detailing the problems with DHS's investigation and explicitly found that DHS's investigation was "biased," and that a DHS witness was not credible when she testified that she considered the petitioner's evidence before issuing DHS's final order. *Id.* at 91.

Here, the trial court questioned whether DHS should have made further inquiries into other witnesses and evidence; it also stated that DHS should have better compartmentalized certain evidence and, essentially, that DHS should have weighed certain evidence differently. However, the trial court made no credibility findings and it did not find that DHS's investigation was biased. Unlike in *Kasliner*, we are not limited in our ability to assess the substantiality of the evidence in the hybrid record developed before DHS and the trial court. Further, although the trial court here expected DHS to consider other witnesses and remanded the matter to DHS for that purpose, we cannot conclude on this record that DHS's failure to contact those witnesses "so thoroughly undermines the evidence that supports [DHS's] determination that the record as a whole would not permit a reasonable person to conclude that DHS had reasonable cause to believe that the reported abuse had occurred." *Querbach*, 369 Or at 803. In other words, the fact that S did not disclose abuse or show signs of abuse to particular third parties, including family friends, does not thoroughly undermine DHS's determination that it had at least reasonable cause to believe abuse occurred based on the substantial evidence it accumulated, namely the consistent disclosures that S made to certain other people, including the school counselor, DHS, law enforcement, and CARES Northwest.

Upon viewing the record as a whole, we conclude that there is substantial evidence in the record to support DHS's "founded" determination. The trial court's stated concerns about DHS's investigation do not affect that

conclusion. *See Querbach*, 369 Or at 804 ("[T]he trial court's comments that DHS's investigation and decision-making process were flawed in certain respects are not relevant to the issue on review, and even if we were to treat them as 'factual findings,' they would not alter the conclusion that we reach here."). Because the trial court erred in remanding the founded disposition of physical abuse, we reverse.

Reversed.