Argued and submitted October 6, 2015, reversed and remanded with instructions to remand to DMV for further proceedings consistent with this opinion February 23, 2017

In the Matter of
the Suspension of the Driving Privileges of

Amanda Rae GAYLORD,
*Petitioner-Respondent,*

*v.*

DRIVER AND MOTOR VEHICLE
SERVICES DIVISION (DMV),
a Division of the Department of Transportation,
*Respondent-Appellant.*

Multnomah County Circuit Court
130405623; A155084

391 P3d 900

Rob Wilsey, Assistant Attorney General, argued the cause for appellant. On the briefs were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Denise G. Fjordbeck, Assistant Attorney General.

Daniel C. Lorenz argued the cause and filed the briefs for respondent.

Before Duncan, Presiding Judge, and DeVore, Judge, and Flynn, Judge.

**DEVORE, J.**

The Driver and Motor Vehicle Services Division (DMV) appeals from a judgment that set aside an administrative order that suspended petitioner's driver's license for a year. The circuit court ruled that an administrative law judge (ALJ) had improperly excluded evidence of a urinalysis of a sample that petitioner gave the morning after her arrest for driving under the influence of intoxicants (DUII). Going further, the circuit court concluded, after taking the urinalysis into consideration, that there was no substantial evidence to support the order suspending petitioner's license. DMV contends that the circuit court erred because the urinalysis evidence is inadmissible and, in any event, there is still substantial evidence to support the ALJ's credibility findings and, therefore, to support the suspension order.

We first conclude that the circuit court correctly determined that the ALJ erred when excluding the urinalysis evidence. We next conclude that the circuit court erred by re-evaluating the competing credibility of petitioner and the arresting officer. To do so was error because the court's proper role was a limited role of reviewing an agency decision. We reverse and remand so that the ALJ, on behalf of DMV, may make a credibility determination after consideration of all the evidence, including the improperly excluded urinalysis.

Our review and that of the circuit court is limited to the record of the agency's hearing. ORS 813.450(2). Neither we, nor the circuit court, are the finders of fact. The role of both courts is to review the DMV order for any errors of law and to determine whether there is substantial evidence in the record to support the order. *Bianco v. DMV*, 257 Or App 446, 448, 307 P3d 470 (2013); *see* ORS 813.450(4) (providing standards for review). We begin with the undisputed historical facts found by the ALJ.

In March 2013, Officer Scott arrived at the scene of an accident. A witness reported having seen petitioner's car "suddenly veer across the lanes of travel and strike" a parked car. The witness said that petitioner looked impaired. Scott testified that petitioner showed signs of impairment: she was unsteady on her feet, her pupils were constricted, she

had facial tremors, her movements were slow, her speech was slurred, and she appeared dazed and disoriented.

Scott asked petitioner if she would perform field sobriety tests, and she initially refused. Scott told petitioner about the tests and that her refusal to take those tests could be used against her. Petitioner refused again. Scott arrested her, and, on the way to the police station, he observed that she was "nodding off" in the back of the car.

At the police station, petitioner used her phone. When she was done, she told the officer that she would agree to perform the field sobriety tests. Scott administered them. Petitioner exhibited six out of six possible clues for impairment during the horizontal gaze nystagmus test, eight out of eight possible clues for impairment during the walk-and-turn test, and two out of four possible clues for impairment during the one-leg stand test.

During his discussion with petitioner, Scott relied on the department's Implied Consent Combined Report (ICCR). That document contains the admonitions that the implied consent law requires police to give to a DUII suspect. According to Scott, his usual practice is to use the ICCR during discussions with DUII suspects because there is a "long list" of admonitions to give and it is "easy to skip one." Scott testified that he usually will put a check mark next to each paragraph that he has read to a suspect. In this instance, the document he used has check marks next to each paragraph in Section I, the section that contains admonitions relevant to breath tests for impairment. There are no check marks next to the paragraphs in Section II, the section with admonitions relevant to urine tests. Scott asked petitioner to take a breath test. She cooperated, and the results indicated a blood alcohol content of 0.00 percent alcohol by volume. Scott also asked petitioner to take a urine test, but she refused. As a consequence, Scott told petitioner that her license would be suspended. Using the ICCR, Scott reported to DMV that petitioner had refused the request for a urine sample.

DMV proposed to suspend petitioner's license for a year. To challenge the suspension, petitioner requested a hearing. It was conducted live, albeit by telephone. In the

hearing, the parties disagreed about the events that led to petitioner refusing to take a urine test. According to the DMV, Scott informed petitioner of all the "rights and consequences" provided by Oregon's Motorist Implied Consent Law. Scott testified that he told petitioner that, if she refused to submit to either a breath test or a urine test, her refusal to the tests could be used against her in subsequent court proceedings.

Petitioner agreed that Scott told her of the consequences of refusing a breath test, but she contended that Scott did not tell her of the consequences of refusing a urine test. Petitioner testified that, after she was released from custody, she went to an emergency care clinic to see if it could perform a urinalysis. Reportedly, the clinic refused, because petitioner did not have any acceptable identification, given that the police had confiscated her driver's license. Later, petitioner found a lab that would perform the test, and, at around 8:00 a.m. the following morning, she provided the lab with a urine sample.

During the hearing, petitioner attempted to have the results of her privately-obtained urinalysis admitted as evidence. The ALJ concluded that the belated urinalysis was not relevant to any issue and refused to allow it to be admitted into evidence. The ALJ rejected petitioner's argument to the effect that the test results were relevant because they made more likely her testimony that she was not told that a refusal to take a urine test would result in a license suspension. Rejecting petitioner's rationale, the ALJ observed that "the issue is not whether there was actually something in her system, it is just whether she refused the urine test." The ALJ reasoned that the issue of whether Scott recited the admonitions about a urine sample would be resolved through the direct testimony of Scott and petitioner.

As for that competing testimony, the ALJ had observed that there are "factors that cut both ways regarding the witnesses' credibility." On one hand, the ALJ noted that Scott's ICCR lacked check marks next to Section II concerning a urine test. According to the ALJ, the lack of check marks indicated that, "if [Scott] followed his usual practice, he did not read those required paragraphs to petitioner prior

to asking her to submit to the urine test." On the other hand, the ALJ acknowledged that Scott testified under oath that "he did, in fact, read those paragraphs to petitioner." Taken together, the ALJ found Scott to be credible. The ALJ reasoned that Scott's sworn testimony about his specific interaction with petitioner outweighed the doubt from deviation from his usual practice.

When evaluating both witnesses' credibility, the ALJ relied on the factors discussed in *Tew v. DMV*, 179 Or App 443, 449, 40 P3d 551 (2002). The ALJ found that, according to petitioner's own testimony, she was "dazed and disoriented from the accident"; that she "exhibited several indicia of impairment"; that petitioner had a substantial personal interest in the outcome of the case; that Scott had no personal interest in the case; and that Scott was a "trained observer." The ALJ found that, although petitioner "sincerely believed that her testimony was truthful," Scott's testimony was more credible than hers. Consequently, the ALJ found that Scott had read "Section II of the ICCR in its entirety to petitioner prior to asking her to submit to a urine test." The ALJ concluded that DMV had "established all of the requirements for a valid suspension."

Petitioner sought judicial review of that order and argued, among other things, that the ALJ erred when he excluded evidence of the results of the privately obtained urinalysis and that there was no substantial evidence to support the ALJ's credibility determinations. The circuit court ruled that the urinalysis results were relevant and that the ALJ should have admitted the evidence. The circuit court reasoned that petitioner's clean results were relevant because "whether petitioner was under the influence is probative of her ability to accurately recall whether the officer gave her implied consent warnings."

Going further, the circuit court concluded that the suspension order, which turned on the ALJ's credibility determination, was not supported by substantial evidence. To reach that conclusion, the circuit court criticized several of the ALJ's findings of fact. First, the court accepted petitioner's argument that Scott's credibility was impeached by the results of the breath test. Scott had testified at the

hearing that he could smell alcohol on petitioner's breath. The breath test, however, was negative for alcohol. Next, the circuit court accepted petitioner's argument that the ALJ's finding that petitioner felt "dazed and disoriented" may have overstated her testimony. Petitioner argued that she felt dazed around the time of the accident, not necessarily that she felt dazed around the time that Scott purportedly gave her the implied consent warnings. Finally, the circuit court questioned the *Tew* consideration that petitioner had an interest in the outcome of the case. In the court's view, that point alone could not be a basis for determining petitioner's credibility because, "[o]therwise, no petitioner would ever be found credible." Adding the clean urinalysis to the circumstances, the circuit court concluded that Scott's testimony could not be found more credible than petitioner's, and, all in all, no substantial evidence supported the suspension order. The court set aside petitioner's license suspension.

The court's reasoning implicates two aspects of our review of the ALJ's order. Our review of the evidentiary issue calls upon our responsibility to determine whether "the department has erroneously interpreted a provision of law and that a correct interpretation compels a particular action." ORS 813.450(4)(a). Our review of the issue of competing credibility calls upon our more limited responsibility to review for "substantial evidence in the record." ORS 813.450(4)(c). The latter responsibility means that "a judge may not substitute his or her opinion for that of the hearings officer on a finding of fact if there is substantial evidence in the administrative record to support that fact, even though there also might be substantial evidence to support a contrary finding." *Wood v. MVD*, 93 Or App 575, 577, 763 P2d 190 (1988).

Under Oregon's implied consent law, "[a]ny person who operates a motor vehicle upon premises open to the public or the highways of this state" and who is arrested for DUII, "shall be deemed to have given consent * * * to a chemical test of the person's breath," ORS 813.100(1), and to "a chemical test of the person's urine," ORS 813.131(1). Police are required to confiscate a person's driver's license if the person refuses to consent to those tests and several other conditions, set by statute, are present. ORS 813.100(3)(a);

ORS 813.131; ORS 813.132. One of those conditions is that police must inform the person that a refusal to take either of those tests will result in the suspension of driving privileges. ORS 813.130(2)(c); ORS 813.132(2).

A person may request a hearing to contest a proposed license suspension. ORS 813.410. The scope of that hearing is prescribed by ORS 813.410(6).[1] As the ALJ observed, a person who refuses a breath or urine test may have their driver's license suspended regardless of whether they actually drove under the influence of an intoxicant. *See* ORS 813.100(3) (refusal of a breath or urine test required by the implied consent law is an independent basis for a license suspension).

On appeal, DMV argues that the ALJ correctly excluded the results of petitioner's urinalysis and that the

---

[1] In relevant part, ORS 813.410(6) provides:

"This subsection shall be narrowly construed so as to effect the legislative purpose of limiting the scope of hearings under this section. The scope of a hearing under this section shall be limited to whether the suspension is valid as described in this subsection. A suspension under this section is valid if all of the following requirements have been met:

"(a) The person, at the time the person was requested to submit to a test under ORS 813.100, was under arrest for driving while under the influence of intoxicants in violation of ORS 813.010 or a municipal ordinance.

"(b) The police had reasonable grounds to believe, at the time the request was made, that the person arrested had been driving under the influence of intoxicants in violation of ORS 813.010 or of a municipal ordinance.

"(c) The person refused a test under ORS 813.100, or took a breath or blood test and the test disclosed that the level of alcohol in the person's blood at the time of the test was [in violation of described standards].

"* * * * *

"(e) The person had been informed under ORS 813.100 of rights and consequences as described under ORS 813.130.

"(f) The person was given written notice required under ORS 813.100."

As for a urine test, in relevant part, ORS 813.132 provides:

"(1) Except as otherwise provided in this section, a refusal to take a urine test requested under ORS 813.131 shall be treated for all purposes as a refusal to take a breath test. * * *

"(2) Before any test of urine may be administered under ORS 813.131, in addition to information described in ORS 813.130, the person asked to take the test shall be informed that if the person refuses the test, the person's driving privileges will be suspended for the same time period and with the same consequences as if the person had refused the breath test and that a suspension for refusal of the urine test will be consecutive to any other suspension under the Motorist Implied Consent Law."

circuit court erred by concluding otherwise.[2] In an administrative proceeding, the law of evidence is governed generally by ORS 183.450, which provides, in part:

> "Irrelevant, immaterial or unduly repetitious evidence shall be excluded but erroneous rulings on evidence shall not preclude agency action on the record unless shown to have substantially prejudiced the rights of a party. All other evidence of a type commonly relied upon by reasonably prudent persons in conduct of their serious affairs shall be admissible. ***"

ORS 183.450(1). The Oregon Administrative Procedures Act does not define the term "irrelevant" or its antonym "relevant." But we may refer to the related provisions of the Oregon Evidence Code. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993) (when interpreting the meaning of a statutory term we consider "the context of the statutory provision at issue, which includes other provisions of the same statute and other related statutes"); *see also Arlington Ed. Assn. v. Arlington Sch. Dist. No. 3*, 177 Or App 658, 663, 34 P3d 1197 (2001), *rev den*, 333 Or 399 (2002) (defining a term in ORS 183.450 with reference to a related term in the evidence code). Under OEC 401, evidence is relevant if it has any "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

---

[2] DMV also argues that we may affirm the ALJ's ruling on the alternative ground that petitioner did not lay an adequate foundation for the admission of the urine test results. Specifically, DMV asserts:

> "There is no evidence in this record showing what was tested for, or how, or whether the lab was certified to do any testing. Nor is there any evidence as to how long common central nervous system depressants persist in urine, and whether they would have been discovered in a test performed the day following the arrest."

That argument was not raised before the ALJ. Had it been, petitioner would have had the opportunity to respond by supplementing the record. As a result, we cannot affirm the ALJ's ruling based on DMV's argument about an improper foundation. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 660, 20 P3d 180 (2001) (we may exercise our discretion to affirm on an alternative basis only when certain conditions are met, including that "the record materially be the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below").

According to the ALJ, petitioner's urinalysis was not relevant because the validity of the suspension of petitioner's driver's license does not depend on whether she was under the influence of an intoxicating substance while she was driving. It is certainly true that, in relevant part here, the state was only required to prove that (1) petitioner was under arrest for driving under the influence, (2) petitioner's breath test disclosed a blood alcohol content of less than 0.08 percent, (3) police had a reasonable suspicion that she had been driving under the influence, (4) she was informed that her license would be suspended if she refused a urine test, and (5) she refused the test. *See* ORS 813.410(6); ORS 813.132(2).

We conclude, however, that, due to the way that this case developed, the question of petitioner's sobriety became relevant because her sobriety became a factor in the determination about the reliability of her memory and, thus, to her credibility and, in turn, to that of the officer. In *Tew*, we identified several factors "other than the manner of testifying" that may be used to assess a witness's credibility: "the inherent probability of the evidence, internal inconsistencies, whether or not the evidence is corroborated, and whether human experience demonstrates that the evidence is logically incredible." 179 Or App at 449. As important here, we recognized in *Tew* that the consumption of intoxicating substances "can affect a person's ability to perceive and remember." *Id*. at 450. In this case, the ALJ's assessment of petitioner's credibility expressly relied on the finding that, while there was little to indicate that petitioner's testimony was meant to be intentionally deceptive, her memory of the events was suspect because she "exhibited several indicia of impairment" around the time of the events in question. If she was *not* under the influence, then her memory would not be suspect for that reason. Because her memory was at issue, her sobriety was relevant, after all.

In addition, petitioner's urinalysis is relevant for another reason. The test results tend to corroborate petitioner's testimony about what she did after she was released from custody and, therefore, to reflect on her relative willingness or resistance to have given a sample if actually advised. She testified that as soon as she was released from

custody she tried to find a facility that would perform a urinalysis for her. The urinalysis provides some probative support for the suggestion that petitioner was willing to provide a urine sample to maintain her driver's license—consistent with her testimony that she asked Scott, after her refusal and his announcement of her suspension, to take the test, after all. The urinalysis provides probative support for the argument that, if petitioner had actually been told that it would result in a driver's license suspension, she would not have refused the urine test. Put in petitioner's terms, the urinalysis shows that she had "no motive" to refuse cooperation because she had nothing to hide. Therefore, the urinalysis has a tendency to make more likely that she was *not* informed of the consequences of refusal. For all of those reasons, we conclude that it was indeed error for the ALJ to exclude petitioner's belated, privately-obtained urinalysis.

We conclude that the ALJ's decision to exclude that evidence "substantially prejudiced" petitioner. ORS 183.450(1). The hearing on petitioner's license suspension was primarily a credibility battle between petitioner and Scott, who were the only two witnesses to testify about the events leading to petitioner's refusal to submit to a urine test. The results of petitioner's urinalysis go to the heart of that case because, as we have explained, those results would have bolstered petitioner's credibility by reducing the probability that petitioner was intoxicated and by increasing the probability that she was not provided the requisite warnings. *See OR-OSHA v. Tom O'Brien Construction Co., Inc.*, 148 Or App 453, 462, 941 P2d 550 (1997), *aff'd*, 329 Or 348, 986 P2d 1171 (1999) (where excluded evidence had the tendency to rebut testimony of a witness for opposing party on which the ALJ expressly relied, the exclusion was prejudicial).

Although we agree with the circuit court on the evidentiary issue, we disagree with the circuit court in its "substantial evidence" review of the suspension order. Our disagreement is based on the limited role of a reviewing court of an agency decision and the effect of a legal error on substantial evidence review. Under ORS 813.450(2) and (4), both the circuit court and this court serve a review function that is "limited to the record of the department's hearing."

*See Bianco*, 257 Or App at 448 (the DMV order is the focus of the two courts' appellate-style review); *Shakerin v. DMV*, 101 Or App 357, 360, 790 P2d 1180 (1990) (explaining statute). In its review of a suspension order, the circuit court is not a *trial* court in the typical sense of making findings of fact. As noted above, a court's review function is not to substitute a court's findings of fact for an ALJ's findings of fact, when there is substantial evidence in the record for the ALJ's finding. This is true even when there is also substantial evidence to the contrary. *Wood*, 93 Or App at 577. When in a review role, a court does not review for the better evidence. A "substantial evidence review does not entail or permit the reviewing tribunal to reweigh or to assess the credibility of the evidence that was presented to the fact-finding body." *Golliher v. DMV*, 173 Or App 586, 590, 22 P3d 780 (2001) (internal quotation marks omitted). Review for substantial evidence is "review to determine whether a reasonable person could have made the findings supporting the decision, not whether a reasonable person could have made different findings." *Shakerin*, 101 Or App at 360.

After concluding that the ALJ committed legal error, the circuit court proceeded to assess the relative credibility of Scott and petitioner. However, the consequence of legal error in this circumstance is that the court must remand the case to DMV for the ALJ to assess the record in the first instance. Therefore, we remand the matter to DMV in order that the ALJ may reassess credibility in light of all admissible evidence. *See Bianco*, 257 Or App at 460 (reversing judgment of the circuit court and remanding to DMV "so that the ALJ, on behalf of DMV, can reconsider the issue").

Reversed and remanded with instructions to remand to DMV for further proceedings consistent with this opinion.