TOOKEY, J.
*650 *567 The Driver and Motor Vehicle Services Division (DMV) appeals a circuit court judgment setting aside an administrative order suspending petitioner's driving privileges for one year. DMV argues that the circuit court erred in reversing that order because substantial evidence supports the administrative law judge's (ALJ) findings of fact, and those findings support the legal conclusion that petitioner had refused to provide a urine sample following her arrest for driving under the influence of intoxicants (DUII).[1] For the reasons that follow, we reverse and remand.
"Although this case comes to us on appeal from the circuit court, we review the underlying administrative order to determine whether the ALJ correctly interpreted and applied the law and whether the order is supported by substantial evidence." Bianco v. DMV , 257 Or. App. 446, 448, 307 P.3d 470 (2013). "We review the ALJ's legal conclusion"-that petitioner refused the urine test-"for legal errors." Fitzpatrick v. DMV , 236 Or. App. 113, 117, 235 P.3d 701 (2010). We state the facts consistently with the ALJ's factual findings. Bianco , 257 Or. App. at 448, 307 P.3d 470.
Officer Dickinson was dispatched to the scene of a single-vehicle traffic crash. Upon arriving, Dickinson observed emergency medical technicians (EMTs) attending to petitioner. The EMTs told Dickinson that petitioner was stable and that she appeared to be intoxicated. Dickinson noticed that petitioner had "droopy eyes and slurred speech" and detected "a sweet smell similar to the odor of alcoholic beverages emanating from [p]etitioner." Dickinson requested that petitioner perform some field sobriety tests; he observed six clues from the horizontal gaze nystagmus *568 test and noticed that petitioner was exhibiting poor balance, at one point nearly falling over. Thereafter, Dickinson arrested petitioner for DUII.
At the police station, Officers Villanti and Bernard similarly observed that petitioner "had slurred speech, droopy eyelids, and slow movements" and detected "a sweet smell similar to the odor of alcoholic beverages emanating from [p]etitioner." Believing that petitioner was impaired, the officers had petitioner take a breath test; that test "disclosed a blood alcohol content of 0.00 percent by weight." Before asking petitioner to submit a urine test, Bernard read Section II of the implied consent form verbatim to petitioner. That section of the form provided:
"(a) If you refuse to submit to a urine test, the length of the suspension period will be the same as if you had refused a breath test. If you provide a urine sample, you will be given privacy and may not be observed by a police officer when producing the sample.
"(b) If you refuse the urine test, you will be subject to a fine of $650.
"(c) The suspension for refusing a urine test will be consecutive to any other suspension under the Motorist Implied Consent Law. In that case, the wait time to be eligible for a hardship permit during the suspension will be doubled. If there is no other suspension, the suspension for refusing a urine test will begin on the 30th day after the arrest, and the wait time to be eligible for a hardship permit will be the same as for refusing a breath test."
*651 Villanti then asked petitioner if she would take a urine test, and petitioner responded, "Okay," but petitioner was upset that the officers were continuing to investigate her for a DUII after her breath test result. The officers provided petitioner with approximately 32 ounces of water, but after 90 minutes and three trips to the bathroom, petitioner failed to produce a urine sample. Petitioner made no statements that she was unable to produce a sample and offered no reason for her failure to provide a sample. Bernard testified that he had warned petitioner "at least once" that if she could not produce a urine sample, "it would be considered a refusal." The officers gave her additional *569 time to produce a sample while petitioner waited for her daughter to pick her up from the police station-three and one half hours after petitioner's arrest.[2] The officers deter-mined that petitioner had refused the urine test when they told petitioner that her daughter had arrived to pick her up and petitioner did not request any additional time to produce a urine sample.[3] Bernard completed an "Implied Consent Combined Report," and gave a copy to petitioner; that report stated:
"You refused to submit to a urine test . You had been involved in an accident resulting in injury or property damage or you had already submitted to a breath test and the result was less than .08%. The officer who requested the urine test was certified by the Department of Public Safety Standards and Training as having completed 8 hours of training in recognition of drug impaired driving, and had reasonable suspicion that you had been driving while under the influence of a controlled substance, an inhalant or any combination of an inhalant, a controlled substance and intoxicating liquor."
(Boldface in original.) The report also indicated that petitioner's suspension for refusing the urine test would be for one year.
Subsequently, petitioner requested a hearing on DMV's proposed suspension of her driving privileges. The ALJ concluded that petitioner had refused the urine test and, consequently, DMV issued a final order suspending petitioner's driving privileges for one year. Petitioner sought judicial review and the circuit court reversed, ruling that petitioner had not refused the urine test.
DMV now appeals, contending that "[s]ubstantial evidence in the administrative record supports the [ALJ's] order suspending petitioner's driver's license for failure to submit a urine test." In response, petitioner contends that the record "does not contain substantial evidence to support *570 the order suspending [petitioner's] driver's license for refusing a urine test."
ORS 813.131(1) provides, in pertinent part:
"Any person who operates a motor vehicle upon premises open to the public or the highways of this state shall be deemed to have given consent, subject to the Motorist Implied Consent Law, to a chemical test of the person's urine for the purpose of determining the presence of cannabis, a controlled substance or an inhalant in the person's body if the person is arrested for driving while under the influence of intoxicants * * * and either:
"(a) The person takes the breath test described in ORS 813.100 and the test discloses a blood alcohol content of less than 0.08 percent; or
"(b) The person is involved in an accident resulting in injury or property damage. A urine test may be requested under this paragraph regardless of whether a breath test has been requested and regardless of the results of a breath test, if one is taken."
ORS 813.132(1) provides, in part, that "a refusal to take a urine test requested under ORS 813.131 shall be treated for all purposes as a refusal to take a breath test."
*652 In the breath test context, the Supreme Court has stated:
"[A] refusal to submit need not be explicit. * * * The word 'refusal,' as used in the Implied Consent Act means nonsubmission * * *. Thus, if an arrested driver is requested to submit to a breath test and, after the statutorily required advice is given [the driver] does not promptly do so, [the driver] has refused to submit. The refusal is implicit in [the driver's] conduct."
Moore v. Motor Vehicles Division , 293 Or. 715, 722, 652 P.2d 794 (1982) (internal citation omitted). Accordingly, "[i]n the breath test context, we have ruled that the officer can insist that the test be conducted promptly. * * * In the urine test context, it is obvious that a more flexible standard must be applied." Robinson v. DMV , 191 Or. App. 122, 125-26, 80 P.3d 536 (2003). Thus, the refusal need not be explicit, and a person who does not provide a urine sample within "a reasonable *571 amount of time" has refused to submit to the urine test. Id. at 125, 80 P.3d 536. That is a case-specific inquiry, and what constitutes a reasonable amount of time will vary according to the facts of each case.[4]
We conclude that the ALJ's findings of fact are sup-ported by substantial evidence. We further conclude that the facts establish that petitioner refused to take the urine test. As noted, the issue of whether petitioner refused the urine test is one of law. In this case, after petitioner took a breath test, Bernard read petitioner the implied consent form relating to requesting a urine test. That section of the implied consent form provided the consequences of a refusal of the urine test, including that the length of the suspension period is the same as if petitioner had refused a breath test. After being informed of the consequence of refusing the urine test, and when asked whether she would provide a urine sample, petitioner responded, "Okay." During the next 90 minutes, petitioner was provided with approximately 32 ounces of water and she made three trips to the restroom. The officers warned petitioner that if she did not produce a sample, her nonsubmission would constitute a refusal. Moreover, the officers allowed petitioner to provide a sample up to the time she was released from custody. Petitioner did not provide a urine sample and, significantly, petitioner did not indicate to the officers that she was unable to produce a sample, offer any reason for not providing a sample, or indicate that she needed more time to provide a sample.
Although the standard for refusal of a urine test is "more flexible" than in the breath test context, given the specific circumstances in this case-where petitioner was informed and reminded of the consequences of a refusal, was provided time and water to provide a urine sample, and did not indicate that she was having difficulty providing a sample or ask for additional time to provide a sample when she was released from custody-we conclude that petitioner's nonsubmission of a urine sample amounted to a *572 refusal. See Tidwell v. DMV , 238 Or. App. 43, 47, 242 P.3d 647 (2010), rev. den. , 352 Or. 107, 284 P.3d 486 (2012) ("The inquiry to determine refusal is focused on the conduct of the arrested driver, not the officer administering the test."); Fitzpatrick , 236 Or. App. at 119, 235 P.3d 701 ("Under the implied consent statutes, the burden is on drivers to articulate a clear assent, not on officers to secure a clear refusal."). Accordingly, the ALJ did not err in concluding that petitioner refused the urine test.
Reversed and remanded with instructions to reinstate DMV order suspending petitioner's driving privileges.

In memoranda of additional authorities, both parties acknowledge, and we agree, that the circuit court erred in impermissibly reweighing the evidence and making its own finding to reach its conclusion that petitioner had not refused to provide a urine sample. See Gaylord v. DMV , 283 Or. App. 811, 822, 391 P.3d 900 (2017) (explaining that, "[i]n its review of a suspension order, the circuit court is not a trial court in the typical sense of making findings of fact" (emphasis in original) ). In any event, that error does not affect our analysis because, as we explain below, the role of the circuit court, and now this court, "is to review the DMV order for any errors of law and to determine whether there is substantial evidence in the record to support the order." Id . at 813, 391 P.3d 900.

The ALJ noted in the order that "[p]etitioner had also been in police custody for at least two hours before the urine test request and there is no evidence indicating that she urinated during that time."

Villanti testified that, if petitioner had asked for more time to produce a urine sample after her daughter arrived, he "would have been fine with it because we still had this packet to finish."

We note that a refusal to take a urine test will not result in a suspension "if the person provides documentation from a physician licensed by this state showing that the person has a medical condition that makes it impossible for the person to provide a sample." ORS 813.132(3) (emphasis added). Petitioner has not relied on that exception.