316 April 8, 2026 No. 284

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

Loris ARCHBOLD,
fka Young,
*Petitioner-Respondent,*

*v.*

DIVISION OF CHILD SUPPORT,
*Respondent-Appellant.*

Marion County Circuit Court
20CV21328; A183854

Lindsay R. Partridge, Judge.

Argued and submitted September 22, 2025.

Inge D. Wells, Assistant Attorney General, argued the cause for appellant. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Jill Foster argued the cause and filed the brief for respondent.

Before Aoyagi, Presiding Judge, Kamins, Judge, and Pagán, Judge.

AOYAGI, P. J.

Reversed.

**AOYAGI, P. J.**

The Division of Child Support (DCS) seeks review of a circuit court judgment reviewing a final order of DCS in other than a contested case under ORS 183.484. Petitioner Loris Archbold was entitled to child support from her ex-husband. DCS assisted in enforcing that obligation by collecting and disbursing funds to petitioner. The child support obligation ended in January 2014, but, because there was a substantial arrearage at that time, DCS continued collecting and disbursing funds until October 2019. In April 2020, DCS issued a final order closing petitioner's case based on a zero balance. Petitioner sought judicial review, asserting that she had not received all the funds. After holding evidentiary hearings, the circuit court entered a general judgment requiring the State of Oregon to pay petitioner $30,255.23 plus interest. It later entered a supplemental judgment requiring the State of Oregon to pay petitioner $23,716.50 for attorney fees and costs. DCS appeals both judgments. As explained below, we reverse.

## I.   FACTS

Petitioner obtained an Oregon child support judgment against her ex-husband, Jermaine Phill, in 1998. The monthly amount initially was $620, increased to $1,087 in mid-2001, and decreased to $522 in mid-2012, before terminating in January 2014. Over the life of the obligation, Phill was required to pay $183,685.13. He ultimately paid the full amount, but, due to an arrearage that accrued between 2007 and 2014, it took longer than the court intended, with the final payment being made in October 2019.

How funds were collected and disbursed changed over time. From March 1998 to mid-July 2006, DCS collected funds from Phill and disbursed them to petitioner by mailing paper checks. From mid-July 2006 to June 2011, DCS collected funds from Phill and deposited them directly into petitioner's bank account. Phill moved to Michigan in 2011. From July 2011 to April 2013, the State of Michigan collected funds from Phill and disbursed them to petitioner by mailing paper checks. In 2013, DCS requested that Michigan send any collected funds to DCS for disbursement,

which Michigan agreed to do. From May 2013 to October 2019, Michigan collected funds from Phill and sent them to DCS, which deposited them directly into petitioner's bank account. In October 2019, DCS made its final disbursement to petitioner, bringing the account balance to $0.

In January 2020, DCS completed an audit of the account and notified petitioner that it would proceed with closure "as we no longer show any money owed." Petitioner requested administrative review under OAR 137-055-6200. DCS issued a final order in April 2020, stating that it had conducted an administrative review of petitioner's child support case balance and determined that the zero balance was correct.

Petitioner sought judicial review of the final order pursuant to ORS 183.484, claiming that the order was not supported by substantial evidence. She asked that the order be set aside or, alternatively, remanded to the agency "for further action under an accurate interpretation of the record and [p]etitioner's account." She claimed that she had not received any of the child support payments collected and disbursed by the State of Michigan, which totaled $22,749.62, because "the address on file was incorrect." Petitioner also alleged that, between 1998 and 2020, the payments made to her were "shorted in small increments totaling $14,335.83." Petitioner concluded by stating that she had been "damaged in the amount of $37,085.45 which has been credited to her account in error although the actual funds have not been received by her" and that DCS's final order "was not supported by substantial evidence."

The circuit court held three evidentiary hearings, totaling just over four hours. The gist of petitioner's evidence and arguments was that petitioner was skeptical that she had received all the payments, that she found DCS's online account information confusing, and that she and her current husband had recently tried with limited success to reconstruct the nearly 22-year payment history using the bank records that she had. Those bank records were admitted into evidence. The amount that petitioner was claiming not to have received kept changing, and it is fair to say that the court's efforts to pin down exactly which payments were

in dispute were unavailing. By the third hearing, petitioner was claiming not to have received $26,109.69 of the total $183,685.13 that was collected.

For its part, DCS provided records showing that $183,685.13 had been collected from Phill over the life of the case, which was exactly what he owed. DCS's "Month-by-Month Summary" shows the amounts collected from Phill each month from February 1998 to October 2019 and the resulting monthly case balances, except for the 22-month period that Michigan was collecting funds and disbursing them to petitioner. For that 22-month period, DCS's month-by-month summaries do not show how much was collected each month; instead, the total amount collected during that period is recorded as a lump sum ($22,749.62) in July 2013. DCS provided separate records from Michigan with the monthly collection detail for those 22 months.

DCS also provided records showing that $183,685.13 had been disbursed to petitioner over the life of the case. The nearly 22-year period at issue is essentially divided into five time periods in terms of records. The records are the least detailed for the first time period, February 1998 to June 2003, for reasons related to DCS's 2003 move out of the Oregon Department of Human Services and into the Oregon Department of Justice; they show only the dates and amounts of each check that DCS issued to petitioner. For the second time period, July 2003 to mid-July 2006, the records are much more detailed, showing the amount of each check issued to petitioner, the date that it was cashed, and the amount paid out, as well as showing that all the checks were mailed to petitioner at her Salem address. Due to the passage of time, DCS no longer had the cancelled checks themselves, which would have been useful to have to show who cashed them. The third time period is mid-July 2006 to June 2011, for which DCS provided records documenting each direct deposit into petitioner's bank account. The fourth time period is July 2011 to April 2013, when Michigan was handling all collections and disbursements; the Michigan records are minimal, showing only the amounts collected from Phill and the amounts disbursed by paper check to petitioner. The fifth time period is May 2013 to October

2019, for which DCS provided records documenting each direct deposit into petitioner's bank account.

DCS's lead financial case adjustor, who conducted a second audit in March 2022, testified that she did not find any discrepancies in the audit and that she was "very confident" that the "disbursements listed in the disbursement history are accurate."

In February 2023, the circuit court issued a letter opinion and remand order. The court described a dispute as to "whether [petitioner] received all the child support collected." It noted that petitioner "sincerely believes" that she did not receive all the payments, while also finding that "at least some of her beliefs regarding the payments are not accurate," which the court attributed to "the difficulty in deciphering the data and the passage of time, rather than the veracity of [petitioner] or [her current husband]." The court was dissatisfied with the evidence on receipt, stating that, "logically," DCS should be able to show whether it was petitioner who cashed the paper checks and whether the direct deposits went to her account. The court faulted DCS for not providing "any evidence" that petitioner actually received the allegedly disbursed funds. The court described itself as "in a position of the DCS claiming the payments were made and [p]etitioner claiming the payments were never received," without "any evidence" to settle the matter. The court noted that not all the payments could be located in petitioner's bank records and that "it appears that some payments were sent to an address in Illinois," with petitioner "speculat[ing] that someone fraudulently contacted DCS to change the address where payments were sent."

Citing a lack of "credible information to determine which payments were received by [petitioner]," the court decided to "remand the case to the agency for determination as to whether [petitioner] actually received the payments." The court directed DCS to determine how and where the child support payments were disbursed, including where the checks issued from 1998 to 2006 were mailed and who endorsed them. The court concluded by stating that DCS had "assumed" in conducting its audit that all funds collected were actually disbursed to and received by petitioner

but failed to produce to the court substantial evidence of actual receipt.

In June 2023, DCS filed a letter with the court stating that it was providing additional records to petitioner's attorney that further confirmed that all of the collected funds were disbursed to petitioner. Petitioner responded with her own letter to the court in September 2023, in which she acknowledged receipt of the additional records but contended that DCS still had not proved that she actually received all the funds. Petitioner stated without explanation that the amount in dispute was now $30,255.23. We are unable to discern from the record how petitioner arrived at that number.

In February 2024, without DCS having issued any new order, and without the court having held any new evidentiary hearing, the circuit court issued a second letter opinion, which effectively superseded the first letter opinion. The court described an ongoing dispute as to "whether [petitioner] received all the child support collected from Mr. Phill by the states of Michigan and Oregon." The court expressed the view that it did not matter "whether DCS collected and disbursed the child support—what matter[ed] [wa]s whether the intended recipient of the child support payments received the funds."

Stating that it had spent a considerable amount of time trying to reconcile the records, the court found there to be no "clear evidence as to whether [petitioner] received the disputed payments." It "seem[ed] likely to the Court that some type of error or fraud occurred in the distribution *[sic]* of the child support payments." As for the amount at issue, the court stated that it had made a "futile attempt to determine the extent of the error or fraud" but was unable to arrive at "a specific amount" due to "inconsistent testimony" and "extremely confusing financial records," coupled with the exacerbating effect of petitioner repeatedly changing how much she was claiming not to have received. Ultimately, the court simply accepted the amount claimed in petitioner's last letter, *i.e.*, $30,255.23. The court then ordered the state to pay that amount to petitioner, based on the lack of "substantial evidence that [petitioner] received th[at] amount."

The court did not cite any authority for making a money award. The court also did not mention the disposition of the order on review (*e.g.*, affirmed, reversed, etc.).

DCS immediately sought reconsideration, arguing that the court had exceeded the scope of judicial review under the Oregon Administrative Procedures Act (APA), including making an unauthorized money award. DCS attached to the motion the additional records that it had provided to petitioner in June 2023, which had not previously been filed with the court. Those records included DCS's child support disbursement report for March 1998 through January 2007, which, for the period through June 2003, showed the amount of each disbursement check issued, the date it was issued, the check number, that petitioner was the payee on the check, and that the check was cashed, and, for the period after June 2003, showed the same information plus the date each check was cashed. The additional records also included Oregon State Treasury reports for 2003 through 2007, confirming that each check that DCS issued to petitioner was cashed. Petitioner did not respond to the motion for reconsideration.

In March 2024, the circuit court entered a general judgment against the State of Oregon for $30,255.23 plus interest. Like the letter opinion, the judgment does not identify the authority on which the court relied to make a money award, nor does it mention the disposition of the order on review. The judgment contains findings, however, and it is our understanding from the language of the judgment that the court considered the additional records provided to petitioner in June 2023 (and later filed with the court), along with the other evidence, in making those findings.[1] The court found (1) that DCS had been ordered to provide evidence of disbursement to petitioner's bank account and/or evidence that she cashed the checks; (2) that the records provided by DCS did not evidence disbursements to petitioner; (3) that the records provided by DCS did not evidence where

---

[1] Because we understand the circuit court to have considered the additional records when entering the general judgment, we also consider them in our analysis on appeal. However, because the judgment is not entirely clear on the point, we note that the disposition on appeal would be the same with or without the additional records.

the payments to petitioner were disbursed; and (4) that the record lacked substantial evidence that petitioner received the disputed payments. The judgment then grants a money award on petitioner's "claim for judicial review," stating:

> "It is hereby ADJUDGED that Petitioner shall have judgment in her favor and against Respondent on [her] claim for judicial review in the amount of $30,255.23 and pre-judgment interest from the date of the final order on April 23, 2020, plus Plaintiffs [*sic*] attorney fees pursuant to ORS 183.497, costs and disbursements to be determined in accordance with ORCP 68 and entered as a supplemental judgment in accordance with ORCP 68 C."

In July 2024, the circuit court entered a supplemental judgment against the State of Oregon, requiring it to pay petitioner $22,310.50 in attorney fees as a discretionary award under ORS 183.497(1)(a), plus $1,406 in costs and disbursements.

## II.   ANALYSIS

DCS raises four assignments of error on appeal. First, DCS contends that its final order closing petitioner's child support case with a zero balance is supported by substantial evidence and that the circuit court therefore erred in entering judgment for petitioner. Second, DCS argues that the circuit court erred in awarding money damages to petitioner, because it lacked authority for such an award. Third, DCS challenges the award of prejudgment interest in the general judgment. Fourth, DCS challenges the supplemental judgment awarding attorney fees and costs. We address each issue in turn.

A.   *Whether the Final Order Is Supported by Substantial Evidence*

The parties agree that the order on review—DCS's April 2020 order closing petitioner's child support case with a zero balance—is a final order in other than a contested case. The parties also agree that, as to the first assignment of error, the only question on review is whether the final order is supported by substantial evidence. The parties disagree, however, as to whether the circuit court properly understood and applied that standard. We therefore begin by describing

what it means to review an order in other than a contested case for "substantial evidence."

Whereas contested cases involve substantial procedural protections at the agency level and result in final orders that come directly to us for judicial review based solely on the agency record, matters other than contested cases are often decided with minimal process. Final orders in such cases must first be reviewed by the circuit court—specifically the Marion County Circuit Court or the circuit court for the county in which the petitioner resides or has a principal business office, ORS 183.484(1)—where the record may be better developed before coming to us for further review. *Compare* ORS 183.482 (judicial review of orders in contested cases), *with* ORS 183.484 (judicial review of orders in other than contested cases). The circuit court level of review in other than a contested case "affords the parties the opportunity to develop a record like the one that parties are entitled to develop at an earlier stage in a contested case proceeding." *Norden v. Water Resources Dept.*, 329 Or 641, 649, 996 P2d 958 (2000). Sometimes, the parties are supplementing an existing agency record. *See Kasliner v. Dept. of Human Services*, 330 Or App 85, 86, 543 P3d 131, *rev den*, 372 Or 560 (2024) ("the parties may submit evidence in the circuit court to supplement the record created by the agency"). Other times, because the APA does not actually require agencies to make records or factual findings in other than contested cases, the review proceeding in the circuit court provides the "first opportunity" for a party to present evidence. *Norden*, 329 Or at 647.

On judicial review of an order in other than a contested case, "it is the parties' ability to create a record in circuit court that the agency never considered that gives rise to the circuit court's authority and sometimes obligation to make findings of fact based on the evidence in that record." *Kasliner*, 330 Or App at 96 (internal quotation marks omitted). In doing so, "the circuit court may not substitute its determination for the one that the agency made," but it may make additional findings based on the evidence submitted to it, and we will "defer to a circuit court's subsidiary findings of fact that are supported by the record in reviewing

an order in other than a contested case for substantial evidence." *Id.* at 96, 100.

The circuit court therefore occupies a somewhat unusual position when reviewing an order in other than a contested case. It may receive new evidence and make its own factual findings based on that evidence, but it is ultimately still reviewing the agency's order for legal error, abuse of discretion, substantial evidence, and the like. *See* ORS 183.484(5) (addressing the scope of review in other than contested cases).

Focusing on substantial evidence, on judicial review of a final agency order, the reviewing court "shall set aside or remand the order if it finds that the order is not supported by substantial evidence in the record. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.484(5)(c); *see Norden*, 329 Or at 649 (the "substantial evidence" standards set forth in ORS 183.482 and ORS 183.484 are identical). Thus, in reviewing for substantial evidence, the court's task is to consider all the evidence in the record and determine whether it "would permit a reasonable person to make the determination that the agency made in a particular case." *Norden*, 329 Or at 649. In the specific context of other than a contested case, the "court assumes that the agency would have reached the same determination if it had heard the evidence introduced both before the agency and in the circuit court" and decides "whether the record developed before both the agency and the circuit court, viewed as a whole, provides substantial evidence to support the decision that the agency made." *Kasliner*, 330 Or App at 92.

It should be noted that "substantial evidence" differs from "any evidence" in that the agency must provide a persuasive explanation when it makes a finding that seems to be contrary to overwhelming evidence. *Armstrong v. Asten-Hill Co.*, 90 Or App 200, 206, 752 P2d 312 (1988) ("The difference between the 'any evidence' rule and the substantial evidence test *** will be decisive only when the credible evidence apparently weighs overwhelmingly in favor of one finding and the [agency] finds the other without giving

a persuasive explanation."). Absent that type of overwhelming evidence, both the circuit court and we are required on judicial review to consider all the evidence in the record, not only evidence that supports the agency's decision, but neither the circuit court nor we are required to "explain away conflicting evidence" in deciding whether the agency's findings are supported by substantial evidence. *Noble v. Oregon Water Resources Dept.*, 264 Or App 110, 124, 330 P3d 688, *rev den*, 356 Or 516 (2014) (internal quotation marks omitted).

Having explained what it means to review an order in other than a contested case for substantial evidence, we turn to the specifics of this case.

In its final order of April 2020, DCS stated that it had conducted an administrative review of petitioner's child support case balance and determined that the zero balance was correct. Petitioner sought judicial review of that order pursuant to ORS 183.484, claiming that it was not supported by substantial evidence, because $37,085.45 had been credited to her account in error, despite her not having received those funds. ORS 183.484 delineates what a circuit court can do on judicial review of an order in other than a contested case and, as relevant here, requires the court to "set aside or remand the order if it finds that the order is not supported by substantial evidence in the record." ORS 183.484(5)(c). Consistent with that APA provision, petitioner asked in her petition that the final order be set aside for lack of substantial evidence or, alternatively, remanded to the agency "for further action under an accurate interpretation of the record and [p]etitioner's account."

After holding three evidentiary hearings and trying to make sense of the fairly voluminous paper records, the circuit court issued two letter opinions a year apart, then entered a general judgment for petitioner that included a $30,255.23 money award against the state. The second letter opinion effectively superseded the first, so we limit our discussion to the second letter opinion and the judgment itself.

DCS argues that the circuit court erred in concluding that the final order was not supported by substantial

evidence. As DCS sees it, the court's interest in petitioner's receipt of the funds may be understandable, but, ultimately, the final order is not about receipt, and the court's focus on receipt led it to misapply the substantial evidence test. Petitioner responds that DCS did not preserve that issue for appeal, *see State v. Wyatt*, 331 Or 335, 341, 15 P3d 22 (2000) ("Generally, an issue not preserved in the trial court will not be considered on appeal."), and that, in any event, the court correctly concluded that the order was not supported by substantial evidence. Petitioner maintains that it is DCS's responsibility to account for all collections and disbursements of child support funds, including proving receipt of the funds by the payee if a dispute arises regarding receipt, and that DCS failed to prove actual receipt in this case.

We begin with preservation. In petitioner's view, DCS should have objected to the first letter opinion, in which the court first focused on the receipt issue and ordered DCS to look for additional receipt evidence, if it wanted to contest the significance of receipt on appeal. We are unpersuaded. Preservation rules are "pragmatic as well as prudential," with "procedural fairness to the parties and to the trial court" being the "touchstone" of the requirement. *Peeples v. Lampert*, 345 Or 209, 220, 191 P3d 637 (2008). "We evaluate whether an issue is adequately preserved in light of the underlying purposes of the preservation rule—to allow the trial court to consider a contention and correct any error, to allow the opposing party an opportunity to respond to a contention, and to foster a full development of the record." *State v. Bordeaux*, 323 Or App 60, 70, 522 P3d 900 (2022), *rev den*, 371 Or 60 (2023) (internal quotation marks omitted).

DCS consistently argued to the circuit court that its final order was supported by substantial evidence, citing evidence that all the child support payments due were collected from Phill and disbursed to petitioner. It is true that DCS cooperated in collecting additional records, rather than objecting to being ordered to do so, but that does not translate into DCS giving up its argument that the order was supported by substantial evidence *regardless* of whether actual receipt could be proved for every payment made over a nearly 22-year period. Throughout the circuit court

proceedings, as reflected in its arguments and filings, DCS took the view that proof of actual receipt was not actually necessary for the order to be affirmed. To the extent that the court's first letter opinion was inconsistent with that view, no judgment was issued, so there was no judgment to appeal, and we do not view DCS's decision not to object to being ordered to look for more evidence as undermining preservation, at least in these circumstances. In short, we do not believe the circuit court would be surprised by DCS's arguments on appeal, regarding whether its order is supported by substantial evidence. *See State v. Skotland*, 372 Or 319, 329, 549 P3d 534 (2024) ("Sometimes, the winds of preservation can be gauged by looking to the weathervane of trial court surprise: Would the trial court be taken aback to find itself reversed *on this issue, for this reason*?" (Emphasis in original.)).

Turning to the merits, we agree with DCS that its final order determining that petitioner's case had a zero balance was supported by substantial evidence in the record as a whole and that the circuit court erred in ruling otherwise. It bears reiterating that, even when the circuit court takes new evidence and makes subsidiary findings of fact, as is permitted on judicial review in other than a contested case, the court is still fundamentally acting in a judicial-review capacity, not deciding the case anew. *Kasliner*, 330 Or App at 96. The circuit court "may not substitute its determination for the one that the agency made." *Id.* "Review for substantial evidence is 'review to determine whether a reasonable person could have made the findings supporting the decision, not whether a reasonable person could have made different findings.'" *Gaylord v. DMV*, 283 Or App 811, 822, 391 P3d 900 (2017).

There are three different findings that DCS potentially could have made in determining that petitioner's case had a zero balance as of April 2020: that all the child support owed by Phill had been collected from Phill, that all the child support collected from Phill had been disbursed to petitioner, and that all the child support disbursed to petitioner was actually received by petitioner. We address each in turn.

Regarding collection, it is undisputed that DCS's final order incorporates a finding that all child support owed by Phill had been collected from him, such that the amount owed by Phill as of April 2020 was zero. That finding has never been contested. That is, petitioner has never claimed that Phill owed more than $183,685.13, or that less than $183,685.13 was collected from him. That aspect of the order is not at issue.

Regarding disbursement, we understand DCS's final order to incorporate a finding that the entire $183,685.13 collected from Phill was disbursed to petitioner, either by DCS issuing a paper check to her (March 1998 to mid-July 2006), by the State of Michigan issuing a paper check to her (July 2011 to April 2013), or by DCS depositing funds directly into her bank account (mid-July 2006 to June 2011 and May 2013 to October 2019). The DCS audit clearly encompassed both collection and disbursement, and DCS offered extensive evidence of disbursement and relied on that evidence in arguing that its order was supported by substantial evidence.

The next question, then, is whether there was substantial evidence in the record to support DCS's finding that all collected funds were disbursed to petitioner, such that the amount remaining for disbursement was zero. The circuit court expressly found in the general judgment that the record lacked evidence of "disbursements" to petitioner. In context, it appears that the court may have meant receipt, rather than disbursement, but to the extent the court meant disbursement, it erred in concluding that the order was not supported by substantial evidence in that regard. There is substantial evidence in the record as a whole that DCS disbursed all the funds that it collected through mid-July 2006 by mailing checks to petitioner at her Oregon address, that DCS disbursed all the funds that it collected from mid-July 2006 to June 2011 by depositing them directly into petitioner's bank account, and that DCS disbursed all the funds that Michigan collected and sent to DCS from May 2013 to October 2019 by depositing them directly into petitioner's bank account. As for the funds collected from July 2011 to April 2013, DCS never possessed those funds and therefore could not disburse

them, but DCS, as the "official record keeper" for the case (which arises from an Oregon child-support judgment), kept track of how much Michigan disbursed, and there is substantial evidence that Michigan did make those disbursements. Importantly, there is no evidence that either DCS or Michigan has retained *any* of the collected funds.

That brings us to the issue of receipt. In our view, the second letter opinion and the general judgment reflect a misunderstanding of the scope of the circuit court's task on judicial review. The final order on review states that DCS reviewed petitioner's case balance and determined that the zero balance was correct. Excluding case identifiers and a notice of the right to appeal, the final order states in full:

**Case Balance Adjustment - Administrative Review**

We have received a written request for an administrative review about an adjustment made to your child support case balance per OAR 137-055-6200. We have determined that:

the adjustment of $0.00 was correct according to our records.

Your balance is $0.00 as of 04/23/2020.

As already discussed, we understand the zero-balance determination to reflect an agency finding that Phill owed zero child support as of April 2020, as well as an agency finding that the amount remaining to be disbursed was zero in April 2020. We do *not* understand it to reflect an agency finding that petitioner actually received every dollar disbursed over the prior nearly 22 years. We are unaware of any statute or rule that would require DCS to obtain proof of the payee's *actual receipt* of all disbursed funds before it can administratively close a child support case with a zero balance. *See* OAR 137-055-1120 (allowing for case closure in various circumstances, including when "[t]here is no longer a current support order and arrearages are under $500").[2] Absent such a requirement, there is simply no way to read

_____

[2] We note that DCS's final order cites OAR 137-055-6200, a rule that "set[s] out what the administrator will do *when an adjustment to the case arrears is needed*" for "an error" or the like. (Emphasis added.) By contrast, OAR 137-055-6010 to OAR 137-055-6026 address distribution and related matters, and we are unaware of any rule that addresses receipt. The parties have largely ignored the specific rule cited in the order.

into the final order on review a finding by DCS regarding petitioner's receipt of disbursed funds. And, absent the existence of such a finding, it cannot be said that the order lacks substantial evidence for that finding.

Petitioner has never identified any legal authority for the proposition that DCS cannot close a child support case based on all child support payments owed having been collected and disbursed to the payee and, instead, can close the case only if it can prove that all amounts collected and disbursed were *actually received* by the payee. If true, DCS would have to leave open forever any child support case in which a third party fraudulently obtained and cashed a check sent to the payee, in which a third party fraudulently withdrew child support funds from the payee's bank account, or in which the payee's bank misprocessed a direct deposit—unless, of course, the state uses public funds to replace the lost or stolen funds and issue another payment. Petitioner offers no legal authority for that view of case closure.

Admittedly, the lack of a clear administrative procedure for payees to raise concerns about receipt of funds collected and disbursed by the state on their behalf is not ideal.[3] However, it does not follow that the circuit court could set aside DCS's final order based on lack of substantial evidence that petitioner personally received all the disbursed funds. DCS's order does not purport to address receipt, nor are we aware of any legal authority requiring DCS to establish actual receipt of all funds before closing a case. The circuit court erred in concluding that the order lacked substantial evidence.

In so holding, we do not mean to suggest that there was *not* substantial evidence that petitioner received the funds that DCS disbursed to her. We address the point briefly, only to illustrate that "substantial evidence" should not be equated with definitive proof. Every single direct deposit made by DCS from July 2006 to October 2019 is

---

[3] There is a grievance procedure in OAR 137-055-1600 that could potentially be used. In any event, as a practical matter, we assume that if a payee notified DCS that one or more payments sent by DCS had not been received, DCS would take timely action to address the issue and ensure proper disbursement. The reason that it was so difficult to pin down whether petitioner received all the funds in this case was because it involved reconstructing over two decades of payment history.

reflected on petitioner's bank records, except for two months for which petitioner did not provide bank records. As for earlier disbursements, the record shows that all of the checks issued from mid-2003 to mid-2006 were mailed to petitioner at her Salem address and timely cashed. Most of those checks can be tied to petitioner's bank records, albeit with varying degrees of certainty.[4] And the checks issued from 1998 to mid-2003 are not at issue, because petitioner was unable to find bank records for that period and therefore did not dispute anything from that period.

As for the checks that Michigan issued to petitioner over a 22-month period in 2011 to 2013—which petitioner previously speculated might have been fraudulently diverted to a family member's address in Illinois, and which are virtually impossible to trace due to Michigan's minimal record keeping, the nature of checks, and the passage of time—it appears that petitioner is no longer contesting receipt of those checks. At oral argument, when asked why DCS would be responsible to compensate petitioner for checks issued by Michigan that petitioner allegedly did not receive, petitioner's counsel acknowledged that petitioner "did get the checks from Michigan" and referenced a record keeping issue. We understand that to be a reference to petitioner's argument below that the Michigan collections might have been accidentally double recorded. There *is* substantial evidence on that issue. The Michigan records show that Michigan collected a total

_____

[4] Given the lack of detail in petitioner's bank records, specifically as to deposits, and the unavailability of the cancelled checks two decades later, it is impossible to determine with absolute certainty whether petitioner personally deposited or cashed every single check issued to her from mid-2003 to mid-2006. DCS mailed 191 checks to petitioner during that period. For 44 checks, petitioner's bank records show a deposit in the exact amount of an individual DCS check in the expected time frame for a deposit. For 18 checks, petitioner's bank records show a deposit in the exact amount of two DCS checks combined, suggesting that she deposited them together. For 88 checks, petitioner's bank records show a partial deposit with the exact same cents amount (*e.g.*, \$0.32 or \$40.32) as a recently issued DCS check (*e.g.*, \$90.32), suggesting that the bank might have recorded only the deposited portion and given the remainder in cash, although petitioner denies ever requesting cash back when depositing a DCS check. For 16 checks, petitioner's bank records are missing the specific pages where a deposit would likely appear if made. That leaves 25 checks that are not readily traceable to petitioner's bank records. Those checks could have been cashed in full by petitioner, could have been deposited with non-DCS checks by petitioner, or could have been fraudulently taken from petitioner's Salem mailbox and cashed by some unknown person.

of $22,749.62 from Phill over the 22-month period and issued checks to petitioner in that same amount, and the Oregon records show that DCS recorded $22,749.62 in collections for that period. The record does not show double recording.

In conclusion, the circuit court erred in ruling that DCS's final order of April 2020, which determined that there was a zero balance on petitioner's child support case, was not supported by substantial evidence. There was substantial evidence that all the child support owed to petitioner had been collected from Phill and disbursed to petitioner. DCS did not need to find that petitioner actually received all the funds in order to close the case, nor did it make any such finding, so the circuit court was mistaken in requiring substantial evidence of actual receipt of all funds to close the case.

B.   *Whether the Circuit Court Had Authority to Award Money Damages*

Our conclusion that the first assignment of error is well taken would seem to obviate the need to address the second assignment of error, in which DCS contends that the circuit court erred by awarding money damages to petitioner. As best we can tell, petitioner does not contest that if the court erroneously set aside the final order, then it also erred in awarding money damages. We nonetheless feel it necessary, or at least prudent, to address the second assignment of error, because it is not entirely clear to us that the circuit court meant to set aside the order or that it viewed the money award as tied to setting aside the order. The court did not state whether it was affirming the final order (such that the case would remain closed) or setting aside the final order (such that it would remain open), nor did it identify any authority for the money award. The general judgment reads like a ruling on a civil claim, granting petitioner "judgment in her favor and against Respondent on [her] claim for judicial review in the amount of $30,255.23."

ORS 183.484(5)(c) provides for the circuit court to "set aside or remand" a final order in other than a contested case "if it finds that the order is not supported by substantial evidence in the record." As for the form and scope of the order, it "may be mandatory, prohibitory, or declaratory

in form, and it shall provide whatever relief is appropriate irrespective of the original form of the petition." ORS 183.486(1). The court may "[o]rder agency action required by law, order agency exercise of discretion when required by law, set aside agency action, remand the case for further agency proceedings or decide the rights, privileges, obligations, requirements or procedures at issue between the parties[.]" ORS 183.486(1)(a). The court may also "[o]rder such ancillary relief as the court finds necessary to redress the effects of official action wrongfully taken or withheld." ORS 183.486(1)(b). "Unless the court finds a ground for setting aside, modifying, remanding, or ordering agency action or ancillary relief under a specified provision of this section, it shall affirm the agency action." ORS 183.486(3).

Here, the circuit court should have affirmed DCS's final order of April 2020 because, as already discussed, it was supported by substantial evidence. We are unaware of any authority that would allow the court to *affirm* the order on judicial review and nonetheless order a money award against the agency. DCS assumes that the court was relying on the "ancillary relief" provision in ORS 183.486(1)(b), and petitioner offers no other possibilities. Assuming *arguendo* that the court relied on ORS 183.486(1)(b), petitioner has not identified any authority by which ancillary relief could be granted in conjunction with affirming the final order. But even if that were possible, ancillary relief would be unavailable in this case, because it is meant "to redress the effects of official action wrongfully taken or withheld," ORS 183.486(1)(b), and there is no evidence of DCS wrongfully taking or withholding any official action. There is no evidence that DCS retained any of the collected funds, that DCS disbursed any of the funds to someone other than petitioner, that DCS was involved in any fraud, or that DCS did anything else that could possibly be considered the wrongful taking or withholding of official action.

Finally, it bears noting that it is far from obvious that DCS could ever be ordered to use public funds to guarantee child support disbursements against third-party fraud, payee bank errors, or the like, even if such an event were proved to have occurred. There is minimal case law

interpreting ORS 183.486(1)(b) and what is permissible ancillary relief under that statute, particularly with respect to money awards. *See Burke v. Children's Services Division*, 288 Or 533, 544, 607 P2d 141 (1980); *Wallace v. State ex rel PERB*, 245 Or App 16, 29-30, 263 P3d 1020 (2011); *Burns v. Board of Psychologist Examiners*, 116 Or App 422, 425, 841 P2d 680 (1992). It follows that any money award made under ORS 183.486(1)(b) should be carefully considered and explained by reference to the statute and the little case law that exists. In this case, however, the circuit court lacked authority to make an award in any event, where the final order was supported by substantial evidence and therefore should have been affirmed, and where there was no evidence that DCS wrongfully took or withheld any official action.

In sum, the second assignment of error is well taken. The circuit court lacked authority to award petitioner $30,255.23 in the general judgment. It follows that the third assignment of error is also well taken, because prejudgment interest cannot accrue when no principal is owed. *See* ORS 82.010(1)(a) (providing for the accrual of prejudgment interest on "[a]ll moneys after they become due"); *Cumming v. Nipping*, 337 Or App 545, 549, 564 P3d 148 (2025) (explaining when prejudgment interest accrues). We reverse the money award in the general judgment in its entirety.

C. *Attorney Fees and Costs*

Having reversed the general judgment, we also reverse the supplemental judgment awarding $22,310.50 in discretionary attorney fees under ORS 183.497(1)(a) and $1,406 in costs and disbursements, which in any event is reversed by operation of law. "When an appeal is taken from a judgment under ORS 19.205 to which an award of attorney fees or costs and disbursements relates[,]" and "the appellate court reverses the judgment, the award of attorney fees or costs and disbursements shall be deemed reversed[.]" ORS 20.220(3)(a); *see also ZRZ Realty v. Beneficial Fire and Casualty Ins.*, 257 Or App 180, 186, 306 P3d 661, *rev den*, 354 Or 491 (2013) (noting that "the legal effect" of reversing a judgment was to also reverse the supplemental judgment for attorney fees that was predicated on that judgment).

Reversed.